**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
         jwilner@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KASRA SARHADI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PEAR HEALTH LABS, INC., d/b/a AAPTIV<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Kasra Sarhadi ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Pear Health Labs, Inc., d/b/a Aaptiv ("Aaptiv" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendant for violating the Video Privacy Protection Act ("VPPA") and California Information Privacy Act ("CIPA").

1. The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

2. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710.

3. With a similar focus on protecting individual privacy, the CIPA prohibits a party from aiding and abetting the wiretapping of private communications without the consent of all parties. Cal. Penal Code § 631.

4. Defendants own and operate Aaptiv, "an AI-powered audio and video fitness app that creates hyper-personalized, adaptable workout plans" (the "App").[1]

5. Unbeknownst to Plaintiff and Class Members, Defendant knowingly and intentionally disclosed its users' personally identifiable information—including a record of every video viewed by the user—and personal information entered into the App to unrelated third parties. By doing so, Defendant violated the VPPA and CIPA.

---

[1] https://play.google.com/store/apps/details?id=com.aaptiv.android&hl=en_US

6.     Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendants' violations of the VPPA and CIPA.

<b><u>PARTIES</u></b>

7.     Plaintiff Kasra Sarhadi is a natural person and citizen of California who resides in San Francisco, California.  Plaintiff Sarhadi was in California when he used the App and entered information into the App.

8.     Defendant Pear Health Labs, Inc. is a Delaware Corporation with its principal place of business at 5421 Avenida Encinas, Suite A, Carlsbad, California 92008.

<b><u>JURISDICTION AND VENUE</u></b>

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

10.     This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

11.     This court has general personal jurisdiction over Defendant because Defendant's principal place of business is in this state.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Plaintiff resides in this District.

<b><u>FACTUAL ALLEGATIONS</u></b>

**I.      HISTORY AND OVERVIEW OF THE VPPA**

13.     The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of

computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted.)

14.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones."  S. Rep. 112-258, at 2.

15.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

## II.      OVERVIEW OF THE CIPA

16.     The CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

17.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

18.    Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

19.    Under Cal. Penal Code § 637.2, Plaintiff Pierro and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

## III.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

20.    Defendant's App "is one of the most popular audio and video-based fitness apps on the market," offering pre-recorded workout videos "and extensive gym network access get people moving and sticking to a custom routine."[2]

21.    The App is available for download on both iOS and Android and is available for use throughout the United States, including California.

---

[2] About Aapitv, https://aaptiv.com/about/.

22.     In particular, the app provides over 8,000 on-demand workouts covering a wide variety of fitness routines such as elliptical sessions, strength training, yoga, and rowing.[3]

23.     Defendant's App hosts thousands of videos, a portion of which are only available with a paid subscription.  All App users, even those with free accounts, must create an account and go through the App's sign-up process to view videos.

## IV.    USERS ENTER CONFIDENTIAL INFORMATION INTO THE APP

24.     When a user creates an account on the App, the App prompts the user to enter personal information through a series of questions as part of the account creation process, including the user's full name, email address, height, weight, and information about the user's fitness and weight loss goals.

25.     Each user must provide all of this information in order to create an account and access the content on the App.

26.     Users reasonably expect that this information will be obtained only by Aaptiv and only for the purpose of assisting with their fitness plan on the App.  They do not expect their private information to be shared with Third Parties.

## V.    DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION AND CONFIDENTIAL COMMUNICATIONS TO THIRD PARTIES

### A.    Testing Reveals That Defendant Illegally Shares Consumers' Personally Identifying Information, Video Viewing Information, and Confidential Communications With Third Parties Twilio and MixPanel

27.     In September 2024, Plaintiff's counsel retained a private research company to review the App and conduct a dynamic analysis.  A "dynamic analysis" records the transmissions that occur from a user's device.

28.     The researchers tested what information (if any) was disclosed when a user enters information into or watches a video on the App.  The analysis revealed that Defendant discloses information to third parties sufficient to identify specific Class Members, view and use their private communications, and learn the specific videos they watched.

---

[3] https://play.google.com/store/apps/details?id=com.aaptiv.android

29.    The analysis first established that Defendant incorporates multiple "application programming interfaces" ("APIs") and "software development kits" ("SDKs") into its App.

30.    APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[4]

31.    SDKs allow developers to "build UI elements, access data, and integrate with third-party services."[5]

32.    Defendant integrates into the App the Segment API, an API owned and operated by Twilio.  Twilio is "a customer engagement platform used by hundreds of thousands of businesses and more than ten million developers worldwide to build unique, personalized experiences for their customers."[6]  Twilio powers this platform through the Segment API, which offers "world-class customer data infrastructure, so [developers] can design hyper-personalized, omnichannel campaigns across all channels."[7]

33.    Defendant also integrates into the App the Mixpanel SDK, an SDK owned and operated by a company of the same name that operates as a digital analytics platform for businesses.

34.    The dynamic analysis found that when a user views a video on the App on either an Android or iOS mobile device, Defendant transmits information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior to both third parties:

## Summary of Third-Party Exfiltration 

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| Segment | Video Title, Video ID | Full Name, Email (unhashed), Birthday, Gender, Height, Weight | User ID, IDFV |
| Mixpanel | Video Title, Video ID | Full Name, Email (unhashed), Birthday, Gender, Height, Weight | User ID |

---

[4] What is an API (application programming interface)?, IBM, https://www.ibm.com/cloud/learn/api.

[5] What is an SDK?, AWS, https://aws.amazon.com/what-is/sdk/.

[6] What is Twilio? An introduction to the leading customer engagement platform, TWILIO, https://www.twilio.com/en-us/resource-center/what-is-twilio-an-introduction-to-the-leading-customer-engagement-platform.

[7] TWILIO SEGMENT, https://segment.com/twilio/.

35.    Specifically, when a user signs up for an account and views a video on the App, Defendant discloses to Twilio through the Segment API a user's (i) full name (iOS only), (ii) email address, (iii) date of birth, (iv) gender, (v) height, (vi) weight, (vii) Segment user ID, and (viii) IDFV, as well as (ix) the title of each video viewed, (x) the video ID of each video viewed and (xi) the fact that a specific video was actually watched or viewed by the user (e.g. "workout finished").  The disclosures are made in real time as information is entered or a video is viewed on the App.



*Transmissions from the Aaptiv App to Twilio.*

36.    Further, when a user signs up for an account and views a video on the App, Defendant discloses to Mixpanel through the Mixpanel SDK a user's (i) full name (iOS only), (ii) email address, (iii) date of birth, (iv) gender, (v) height, (vi) weight, (vii) Segment user ID, and (viii) IDFV, as well as (ix) the title of each video viewed, (x) the video ID of each video viewed and (xi) the fact that a specific video was actually watched or viewed by the user (e.g. "workout finished").  The disclosures are made in real time as information is entered or a video is viewed on the App.

*Transmissions from the Aaptiv App to Mixpanel.*

### 1.    <u>Overview of the Segment API</u>

37.    Twilio is "a customer engagement platform used by hundreds of thousands of businesses and more than ten million developers worldwide to build unique, personalized experiences for their customers."[8]

38.    Twilio powers this platform through its Segment API, which offers "world-class customer data infrastructure, so [developers] can design hyper-personalized, omnichannel campaigns across all channels."[9]    In particular, once integrated into a developer's mobile application, the Segment API provides Twilio's platform with "customer identification and segmentation,"[10] and it does this by "collecting and connecting data from other tools and aggregating the data to monitor

---

8 What is Twilio? An introduction to the leading customer engagement platform, Twilio, https://www.twilio.com/en-us/resource-center/what-is-twilio-an-introduction-to-the-leading-customer-engagement-platform.

9 Twilio Segment, https://segment.com/twilio/.

10 Ingrid Lunden, *Twilio Confirms It Is Buying Segment For $3.2b In An All-Stock Deal*, TechCrunch (Oct. 12, 2020), https://techcrunch.com/2020/10/12/twilio-confirms-it-is-buying-segment-for-3-2b-in-an-all-stock-deal/.

performance, inform decision-making processes, and create uniquely customized user experiences."[11]

39.     As alleged in greater detail below, Defendants utilize each and every one of these features of the Segment API in the App and sends their consumers' PII to Twilio through the Segment API in order to assist with Defendants' marketing, advertising, and analytics efforts.

## 2.     Overview of the Mixpanel SDK

40.     Mixpanel defines itself as: "an analytics tool that enables you to capture data on how users interact with your digital product.  Mixpanel then lets you analyze this data with simple, interactive reports that let you query and visualize the data with just a few clicks."[12]

41.     Mixpanel's data model captures three main categories of information: events, users, and properties.[13]  While "[a]n event is a data point that represents an interaction between a user and your product," users are the specific individual "[o]n the other side of an event."[14]

---

[11] Segment.io Defined, INDICATIVE, https://www.indicative.com/resource/segment-io/.

[12] What is Mixpanel?, MIXPANEL, https://docs.mixpanel.com/docs/getting-started/what-is-mixpanel.

[13] *See* Data Model: How Mixpanel is Organized, MIXPANEL, https://docs.mixpanel.com/docs/data-structure/concepts.

[14] *Id.*

42.    Mixpanel highlights that it allows clients like Defendant to track information such as what videos users watch.[15]



43.    "It takes less than 5 minutes to track events to Mixpanel."[16]  The Mixpanel SDK then analyzes user behavior from user "events."[17]

---

[15] What toTrack?, MIXPANEL,  https://docs.mixpanel.com/docs/what-to-track.

[16] *Id.*

[17] About, MIXPANEL, https://mixpanel.com/about.

1

44.      Mixpanel's SDK offers Defendant a sophisticated user analysis:[18]



45.      Specifically, Mixpanel's SDK offers Defendant the ability to aggregate and organize user information into "user profiles."[19]   "Mixpanel's Users page aggregates and organizes a collection of user profiles. This facilitates a granular view into the behavior of individual users or groups of users.  The Users page can be used to: [c]ount users based on behavior, [e]xplore their unique history, [u]pdate user profiles, [and] [c]reate cohorts of groups of users."[20]  "Because each user is unique, Mixpanel tracks which users completed what events and marries the two distinct data points by joining them."[21]

46.      The third category of information that Mixpanel catches and collects, the 'properties' of events and users, "are attributes that help [clients] define the specifics."[22]   Mixpanel collects identifying factors of a user as properties.  "This could be [a user's] name, email, or age."[23]

---

[18] *See generally*, Users, MIXPANEL, https://docs.mixpanel.com/docs/analysis/users;Product Analytics, MIXPANEL, https://mixpanel.com/analysis.

[19] *Id.*

[20] Users, MIXPANEL, https://docs.mixpanel.com/docs/analysis/users.

[21] *Id.*

[22] *Id.*

[23] *Id.*

47.    In addition, Plaintiff's testing reveals that Mixpanel collects the AAID from the user's device each time that a transmission is made from an app with the Mixpanel SDK installed.

48.    The AAID is a device-specific unique identifier used for advertising on Android devices.[24]

49.    Mixpanel uses the AAID to match the data transmissions from specific users across different apps, allowing Mixpanel to create detailed profiles of consumer activity.

50.    This tracking makes Mixpanel's "user profiles" more valuable to future clients because they contain unified details of user activity across many apps used by an individual.

### 3.    Defendant Discloses Class Members' Full Names, Email Addresses, And Dates Of Birth To Twilio And Mixpanel

51.    A full name is self-evidently identifiable information because it is the name someone goes by in all public and private interactions throughout their life.

52.    An email address is a unique string of characters that designates an electronic mailbox.  As industry leaders,[25] trade groups,[26] and courts agree,[27] an ordinary person can use an email address to uniquely identify another individual.  Indeed, there exist multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.[28]

53.    A person's date of birth can be combined with other information to sufficiently identify a person, as it is specific to each individual and narrows the possible field of individuals to be identified to about .3 percent.

---

[24] Google, *Target mobile apps with IDFA or AAID*, https://support.google.com/authorizedbuyers/answer/3221407?hl=en.

[25] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[26] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[27] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[28] *See, e.g.*, www.beenverified.com.

54.    As the dynamic analysis establishes, when a user watches a video on the App, Defendants disclose users' full names, e-mail addresses, and dates of birth to Twilio via the Segment API and Mixpanel via the Mixpanel SDK.  The following excerpts from the dynamic analysis are demonstrative:

```
"event": "onboarding-birthday-select",
"integrations": {
},
"messageId": "4B88655B-6C07-4079-B0D7-8FB52463C012",
"properties": {
  "answerValue": "1988-02-02",
```

```
timestamp : 2024 09 05110.07.40.000
"traits": {
"email": "bravibraveary@gmail.com",
"first name": "Benjamin",
"isStaff": "false",
"last name": "Khoury",
```

### 4.    Defendant Discloses Class Members' User IDs to Twilio and Mixpanel

55.    A user ID is a unique string of numbers which third parties assign to users upon accessing a particular mobile application, allowing developers, like Defendants, to "[t]rack [their] users across devices and platforms, improving the quality of [their] behavioral and demographic data."[29]  A user ID can also "include names, email addresses, timestamps, or incrementors."[30]

56.    By disclosing user IDs to Twilio and Mixpanel, Defendant discloses information that is reasonably and foreseeably likely to identify specific Class Members.

### 5.    Defendant Discloses Information Identifying Which Specific Videos Were Watched By Which Specific Class Members To Twilio And Mixpanel

57.    Defendant discloses the full name of each video viewed by each user to Twilio and Mixpanel.

---

[29]    Setting User IDs for Android and FireOS, BRAZE, https://www.braze.com/docs/developer_guide/platform_integration_guides/android/analytics/setting_user_ids/.

[30]    Id.

58.    For example, the dynamic analysis was conducted while a video called "Child's Pose For Relaxation" was played on the App.  As demonstrated below, this title is a video provided by Aaptiv and the title of that video was disclosed to Twilio and Mixpanel.

```
Mobile\/15E148"},"event":"playerWorkoutFinished","integrations":{},"messageId":"47A6B618
-A6F8-4AA3-BE84-682EB865733F","properties":{"calories":"15","classCreated":"2024-09-03T1
8:10:59Z","difficulty":"3","duration":"305946","has-moves":"true","id":"628b9b9a1db72653
2111fa46","isStaff":"false","mediaType":"audio","membership":"MEMBER","musicGenre":"591a
27470002acbbd0cc76ba","musicSource":"feedFm","name":"Child...s Pose For
Relaxation","new":"false","offlineList":"false","parentId":"66cbbbbf9f4152004f3ea269","p
arentName":"Fall Into
Yoga","parentType":"upcomingChallenges","percentage":"0.4162338","plan":"MONTHLY","planS
```

59.    This network traffic is transmitted when, and only when a user actually watches a video.  This is evidenced by the fact that, when the data is transmitted to Twilio and Mixpanel, the user's interactions with video (e.g., workout finished) are also transmitted.

60.    In summary, Defendant discloses information to third parties, like Twilio and Mixpanel, that would make it reasonably and foreseeably likely that Twilio and Mixpanel could identify which specific user requested or obtained which specific video.  Indeed, the information Defendant discloses is so identifying that even an ordinary person could identify which specific user requested or obtained which specific video.    Accordingly, Defendant discloses personally identifiable information to third parties.

### 6.    Defendant Aids The Interception Of Class Members' Confidential Communications

61.    When creating an account, which is mandatory to watch videos or access any of Aaptiv's services on the App, users are required to enter personal information, which will supposedly help personalize the program to the needs of each user.

62.    This information, which users believe is a confidential communication between themselves and Aaptiv, is in fact transmitted to Twilio and Mixpanel without users' consent.

63.     The dynamic analysis found the user's date of birth, communicated to Aaptiv during the signup process, is transmitted to Twilio and Mixpanel.

```
"event": "onboarding-birthday-select",
"integrations": {
},
"messageId": "4B88655B-6C07-4079-B0D7-8FB52463C012",
"properties": {
  "answerValue": "1988-02-02",
```

64.     Similarly, the dynamic analysis found the user's weight, communicated to Aaptiv during the signup process, is transmitted to Twilio and Mixpanel.

```
"event": "onboarding-current_weight-select",
"integrations": {
},
"messageId": "1EFA7F7E-E82A-460F-8374-B8D3B718A2E7",
"properties": {
  "answerValue": "168",
```

65.     Similarly, the dynamic analysis found the user's height in inches, communicated to Aaptiv during the signup process, is transmitted to Twilio and Mixpanel.

```
"event": "onboarding-height-select",
"integrations": {
},
"messageId": "35934464-35A5-4966-97CB-225C4833518D",
"properties": {
  "answerValue": "69",
```

66.     Similarly, the dynamic analysis found the user's gender, communicated to Aaptiv during the signup process, is transmitted to Twilio and Mixpanel.

```
"event": "onboarding-gender-select",
"integrations": {
},
"messageId": "B7A2DCB0-64CB-47E2-9A2C-6AD5C55D6265",
"properties": {
  "answerValue": "Female",
```

67.     Each communication is intercepted in transit, as it is sent to Twilio and Mixpanel in real time as the information is entered into the App.  Further the intercepted communications are both sent from (California users' devices) and received in (Twilio's and Defendant's servers) locations in California.

68.     Consistent with their business models, which involve collecting the intercepted information to produce targeted advertising and marketing analytics, both Twilio and Mixpanel view each and every intercepted communication, process the information received, and then assemble the information for advertising purposes.

69.     Users are not informed that their communications and private information are being transmitted to third parties and do not give their consent to the same.

70.     Since at least October 2023, if not earlier, Defendant employed the services of Twilio and Mixpanel and their wiretaps on each page of the App sign up process to track users' communications and send those communications to third parties so the third parties can analyze the information and enable Defendant to target users with ads based on those answers.

**B.      Defendant Discloses Personally Identifiable Information And Confidential Information To Third Parties For The Purpose Of Marketing, Advertising, And Analytics.**

71.     Defendant discloses personally identifiable information and confidential communications to Twilio and Mixpanel so they can help Defendant with marketing, advertising, and analytics.

72.     As alleged above, the Segment API and Mixpanel SDK are designed to analyze App data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendants' revenue from their video-based marketing and advertising on the App.  *See*, *e.g.*, *Saunders v. Hearst Television, Inc.*, 711 F.Supp.3d 24, 33 (D. Mass 2024) (disclosures to Braze and Google for "marketing, advertising, and analytics – do not fall within the [ordinary course of business] exception[]") (cleaned up); *Rancourt v. Meredith Corp.*, 2024 WL 381344, at *17 (D. Mass. Feb. 1, 2024) (same as to disclosures to Twilio for "targeted advertising … which is intended to drive revenue").

### 1.     Defendant Disclosed Personally Identifiable Information and Confidential Communications To Twilio For The Purpose Of Marketing, Advertising, And Analytics

73.     Twilio entices developers to integrate the Segment API by underscoring its signature feature: "Engage."  Formerly known as Personas, Engage "is a powerful personalization platform that helps you create unified customer profiles."[31]  Twilio creates these "unified customer profiles" by "tak[ing] event data from across devices and channels and intelligently merg[ing] it into complete

---

[31] Documentation, SEGMENT, https://segment.com/docs/engage/.

user- or account-level profiles."[32]    Twilio then illustrates what developers, like Defendant, can expect:



74.    Twilio builds these personas through "Segment Identity Resolution."  This process "merges the complete history of each customer into a single profile, no matter where they interact with your business."[33]  The Segment Identity Resolution supports, among other identifiers, "cookie IDs, device IDs, emails, and custom external IDs," helping Twilio capture "a user's interaction across web, mobile, server and third party partner touch-points in real-time[.]"[34]  The Segment Identity Resolution then combines these "multiple external IDs," into "one persistent ID,"[35] culminating into its profile of each user:

---

[32] *Id.*

[33]    Identity    Resolution    Overview,    SEGMENT,    https://segment.com/docs/personas/identity-resolution/#:~:text=The%20Segment%20Identity%20Graph%20merges,they%20interact%20with%20your%20business.

[34] *Id.*

[35] *Id.*



75.     With Identity Resolution, Twilio associates a users' AAID with a corresponding Persona Profile on Twilio's platform.  Because Twilio assembles information from other sources into the Persona Profile, AAID alone allows Twilio to identify a particular person.

76.     Twilio leverages these profiles to assist developers, like Defendant, in enhancing their marketing, advertising, and analytics efforts.

77.     Defendant discloses users' PII to Twilio through the Segment API so Twilio can better target its marketing campaigns.  Defendant does this through Twilio's "Audience" feature, which "group[s] users or accounts based on event behavior and traits that Segment tracks."[36]  In other words, Audiences allows for targeted marketing of advertisements at Engage profiles that fit specific parameters.  As explained below, Defendant builds these marketing campaigns through Twilio's analytics services.

78.     Defendant also discloses users' PII to Twilio, through the Segment API, so they can better target advertisements.  After Defendant discloses users' PII, Twilio compiles and transmits that information to other third parties that Defendant utilizes for targeted advertising, such as

---

[36] Engage Audiences Overview, SEGMENT, https://segment.com/docs/engage/audiences/.

Meta/Facebook, Google, and Salesforce.[37] Twilio labels these companies "Segment Destinations," which are tools that businesses use for personalization and marketing.[38]

79.    In this role, Twilio acts as a facilitator, compiling PII so developers can "personalize messages across channels, optimize ad spend, and improve targeting."[39]  When Twilio transmits PII to Facebook, for example, it sends "an expanded list of identifiers or traits to Facebook, so that Facebook can try to use these additional datapoints to match to their user profiles."[40]  The same goes for Google, with Twilio helping developers "run advertising campaigns without having to manually update the list of users to target in Adwords campaigns."[41]  Defendants utilize Twilio to amplify their advertising campaigns.

80.    Defendants then build marketing campaigns based on this analysis. For Aaptiv, Defendant selects traits like "e-mails received" or "videos viewed" and send distinct marketing e-mails and advertisements to users who have those traits.

81.    Twilio describes the above process as "building an Audience," meaning it "group[s] users or accounts based on event behavior and traits that Segment tracks."[42]  As an example, Twilio lets developers "create[e] an 'inactive accounts' audience that lists paid accounts with no logins in 60 days."[43]  After, "developers can push the audience to your marketing and analytics tools."[44]

82.    In short, Defendant utilizes the Segment API to analyze user data, launch marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this, especially in conjunction with Segment's marketing and advertising services, helps Defendant

---

[37] Using Engage Data, SEGMENT, https://segment.com/docs/engage/using-engage-data/ (these third parties include Facebook, Google, and Salesforce).

[38] *Id.*

[39] *Id.*

[40]    Facebook Custom Audiences Destination, SEGMENT, https://segment.com/docs/connections/destinations/catalog/personas-facebook-custom-audiences/.

[41] *Id.*

[42] Engage Audiences Overview, SEGMENT, https://segment.com/docs/engage/audiences/.

[43] Documentation, SEGMENT, https://segment.com/docs/engage/.

[44] *Id.*

monetize the App and maximize revenue by collecting and disclosing as much information as possible to Twilio via the Segment API.

**2.** **Defendant Disclosed Personally Identifiable Information and Confidential Communications to Mixpanel For The Purpose of Marketing, Advertising, And Analytics**

83.    Defendant transmits PII and confidential communications to Mixpanel so the Mixpanel API can "analyze" user metrics, "[v]iew how users convert at each step," and "[monitor] growth[,] engagement," and "retention."[45]  By doing so, Mixpanel claims it allows clients like Defendant to "make changes that lead to customer loyalty."[46]

84.    Mixpanel appears to offer a built-in data tracking service that tracks all of a client's users:[47]



85.    Mixpanel's technology then analyzes the captured user data and generates several types of reports.  These reports cover "[i]nsights, [f]unnels, [f]lows, [r]etention and other advanced reports, each with their specialized use."[48]   Mixpanel's reports aid Defendant in marketing, advertising, and analytics in the App.

---

[45]Product Analytics, MIXPANEL, https://mixpanel.com/analysis.

[46] *Id.*

[47] Users, MIXPANEL, https://docs.mixpanel.com/docs/analysis/users.

[48] Reports Overview, MIXPANEL, https://docs.mixpanel.com/docs/analysis/reports.

## VI.    PLAINTIFF'S EXPERIENCE

86.    In or around June 2020, Plaintiff downloaded the App on his Apple iPhone and created an Aaptiv account by entering information into the App as described above.

87.    As Plaintiff entered his personal information and private health information into the App (*i.e.*, in real time), Twilio and Mixpanel—as aided, agreed with, employed, and procured by Defendant—wiretapped Plaintiff's communications with Defendant.

88.    The Third Parties viewed and processed each and every one of Plaintiff's communications with Defendant's App and used the information for data analytics and targeted advertising, as described above.

89.    The Third Parties' recording of electronic communications begins the moment a user accesses or interacts with Defendant's Website, prior to a user consenting to any sort of privacy policy or the APIs generally.  Nor are users told, prior to being wiretapped, that their electronic communications are being simultaneously directed to Twilio and Mixpanel, rather than only to Aaptiv.

90.    Plaintiff was thus not on notice of any wiretapping when he began entering information into Defendant's App, nor did he provide prior consent to the same.

91.    Twilio and Mixpanel had access to Plaintiff's and Class Members' communications and personal information entered on Defendant's App because each company contracts with Aaptiv to hide the respective API and SDK in the App.

92.    Plaintiff did not discover that his communications had been wiretapped until October 2024.

93.    Plaintiff used the App regularly from June 2020 to September 2024.  During that time, he used the App to watch various videos, including watching videos in September 2024.

94.    At all times relevant, Plaintiff never consented, agreed, nor otherwise permitted the App to disclose his PII to third parties.

95.    Likewise, Defendant never gave Plaintiff the opportunity to prevent the App from disclosing his PII to third parties.

96.    Nevertheless, each time Plaintiff viewed a video on the App, Defendant disclosed his PII to Twilio via the Segment API.  Specifically, Defendant disclosed to Twilio via the Segment API Plaintiff's: (i) full name, (ii) email address, (iii) date of birth, (iv) gender, (v) height, (vi) weight, (vii) Segment user ID, and (viii) IDFV, as well as (ix) the title of each video he viewed, (x) the video ID of each video he viewed.  Using this information, Twilio was able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff in its databases.  Indeed, even an ordinary person could identify Plaintiff using the data Defendant disclosed to Twilio.  Plaintiff's PII was also used to create a user profile that included her activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

97.    In addition, each time Plaintiff viewed a video on the App, Defendant disclosed his PII to Mixpanel via the Mixpanel SDK.  Specifically, Defendant disclosed to Mixpanel via the Mixpanel SDK Plaintiff's: (i) full name, (ii) email address, (iii) date of birth, (iv) gender, (v) height, (vi) weight, (vii) user ID, and (viii) IDFV, as well as (ix) the title of each video he viewed, (x) the video ID of each video he viewed.  Using this information, Mixpanel was able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff in its databases.  Indeed, even an ordinary person could identify Plaintiff using the data Defendants disclosed to Mixpanel.  Plaintiff's PII was also used to create a user profile that included Plaintiff's activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

## CLASS ALLEGATIONS

98.    **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who had their PII and confidential communications with App transmitted to a third party (the "Class").

99.    **Subclass Definition:** Plaintiff also seeks to represent a class of similarly situated individuals defined as all persons in the United States with an Aaptiv account who watched a video on the App who had their PII transmitted to a third party (the "VPPA Subclass").

100.    **Subclass Definition:** Plaintiff also seeks to represent a subclass of similarly situated individuals defined as all persons in California who had their PII and confidential communications with the App transmitted to a third party (the "California Subclass").

101.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

102.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of the App, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

103.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

> (a)    whether Defendant collected Plaintiff's and the Class' PII and confidential communications;

> (b)    whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

> (c)    whether Defendant unlawfully disclosed and continues to disclose its users' confidential communications, in violation of the CIPA;

> (d)    whether Defendant's disclosures were committed knowingly; and

> (e)    whether Defendant disclosed Plaintiff's and the Class' PII and communications without consent.


104.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class and subclasses because Plaintiff, like all members of the Classes, entered information into the App and watched videos on the App and had his PII and communications disclosed by Defendants to third parties.

105.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action

litigation, including litigation concerning the VPPA and its state-inspired offspring and the CIPA. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class and subclasses. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class or subclasses. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class or subclasses to address any steps that Defendant took.

106. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of the VPPA**
**18 U.S.C. § 2710**

107. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

108. Plaintiff brings this claim individually and on behalf of the members of the proposed VPPA Subclass against Defendant.

109. Defendant is a "video tape service provider[s]" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery

of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides videos (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via their App.

110.    Plaintiff and members of the VPPA Subclass are "consumers" as defined by the VPPA because they downloaded, installed, and watched videos using the Apps.  18 U.S.C. § 2710(a)(1).  Under the VPPA, therefore, Plaintiff and members of the Class are "subscribers" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1); *see also Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 487-89 (1st Cir. 2016).

111.    Plaintiff and members of the VPPA Subclass viewed videos using the App.  During these occasions, the Apps disclosed Plaintiff's and members of the Class' PII.  Specifically:

- Plaintiff's and Class Members': (i) full names, (ii) email addresses, (iii) dates of birth, (iv) gender, (v) height, (vi) weight, (vii) user ID, and (viii) IDFV, as well as (ix) the title of each video viewed by Plaintiff and Class Members, (x) the video ID of each video viewed by Plaintiff and Class Members were disclosed to Twilio via the Segment API.

- Plaintiff's and Class Members': (i) full names, (ii) email addresses, (iii) dates of birth, (iv) gender, (v) height, (vi) weight, (vii) user ID, and (viii) IDFV, as well as (ix) the title of each video viewed by Plaintiff and Class Members, (x) the video ID of each video viewed by Plaintiff and Class Members were disclosed to Mixpanel via the Mixpanel SDK.

112.    The App's transmissions of Plaintiff's and Class members' PII to Twilio and Mixpanel via the Segment API and Mixpanel SDK constitute "knowing[] disclosures" of Plaintiff's and members of the Subclass' "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

113.    Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The information disclosed by the App constitutes "personally identifiable information" because it allows even an ordinary person

to identify Plaintiff and members of the VPPA subclass, as well as which specific videos were watched by Plaintiff and the subclass. The disclosures also make it "reasonably and foreseeably likely to reveal" which specific App videos were obtained by each Plaintiff and each member of the subclass.

114.    Plaintiff and members of the VPPA Subclass did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

115.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Apps' disclosures were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). This is underscored by the third parties' use of device-specific identifiers, which track activity across various apps solely for the purpose of improving the third parties' consumer profiles and advertising.

116.    On behalf of himself and the VPPA subclass, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### Violation of the CIPA
### Cal. Penal Code § 631(a)

117.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

118.    Plaintiff brings this claim individually and on behalf of the Class and California Subclass against Defendant.

119.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including

the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

120.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier*, 2022 WL 1744107, at *1 ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

121.    The Segment API and Mixpanel SDK are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

122.    Twilio and Mixpanel are each a "separate legal entity that offer[] [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, each Third Party had the capability to use the wiretapped information for its own purposes. Accordingly, Twilio and Mixpanel were each a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

123.    At all relevant times, by using the Segment API and Mixpanel SDK, Twilio and Mixpanel, willfully and without the consent of all parties to the communication, or in any

unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

124.    At all relevant times, Twilio and Mixpanel used or attempted to use the communications intercepted by their APIs to improve their products and services, track and advertise to internet users across websites, and generate revenue for themselves and their clients.

125.    At all relevant times, Defendant aided, agreed with, employed, or otherwise enabled Twilio and Mixpanel to wiretap consumers to the App using the wiretaps and to accomplish the wrongful conduct at issue here.

126.    Plaintiff and Class Members did not provide their prior consent to the third parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, or otherwise enabling the conduct at issue.

127.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff accessed the App, where Plaintiff's communications were redirected from Defendant's servers, and where the third parties—as enabled by Defendant—routed Plaintiff' and Class Members' electronic communications to Twilio and Mixpanel's respective servers.

128.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    An award of statutory damages to the extent available;

(e)    For punitive damages, as warranted, in an amount to be determined at trial;

(f)    For prejudgment interest on all amounts awarded;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  November 12, 2024          **BURSOR & FISHER, P.A**.

By: ___*/s/ L. Timothy Fisher*___
　　　　　L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
　　　　jwilner@bursor.com

*Attorneys for Plaintiff*