**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jwilner@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

KASRA SARHADI, individually and on behalf of all others similarly situated

Plaintiff,

v.

PEAR HEALTH LABS, INC., D/B/A AAPTIV,

Defendant.

Case No. 3:24-cv-7921-TLT

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

Date: April 22, 2025
Time: 2:00 p.m.
Room: Courtroom 9
Judge: Hon. Trina L. Thompson

# TABLE OF CONTENTS

PAGE


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. DEFENDANT VIOLATED THE VPPA ........ 2

A. Defendant Disclosed PII To Twilio And Mixpanel For Marketing, Advertising, And Analytics, Which Fall Outisde The Ordinary Course Of Business ........ 2

B. Defendant's Arguments Are Unpersuasive ........ 5

II. DEFENDANT VIOLATED CIPA § 631 BY AIDING, AGREEING WITH, EMPLOYING, OR OTHERWISE ENABLING THE WIRETAPPING ........ 8

A. Twilio And Mixpanel Were Third-Party Wiretappers To Plaintiff's Communications With The App ........ 8

1. Twilio And Mixpanel Are Third-Party Wiretappers Under The "Capability" Approach, Which The Court Should Adopt ........ 9

2. Twilio And Mixpanel Are Third-Party Wiretappers Under The "Extension" Approach, Which The Court Should Reject ........ 12

B. Twilio And Mixpanel Intercepted The Communications In Transit ........ 16

C. Twilio And Mixpanel Used The Intercepted Communications ........ 18

D. Defendant Has Not Met Its Burden To Show That Plaintiff And Class Members Consented To The Wiretapping ........ 19

1. Defendant Has Not Shown Plaintiff And Other Class Members Were On Notice Of Or Consented To The Wiretapping ........ 19

2. Defendant Has Not Shown That The Privacy Policy Disclosed The Wiretapping ........ 21

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ade v. Viki, Inc.*,
2024 WL 1880153 (N.D. Cal. Mar. 28, 2024) ... 4

*Balletto v. Am. Honda Motor Co.*,
2023 WL 7026931 (N.D. Cal. Oct. 24, 2023) ... 13

*Balletto v. Am. Honda Motor Co.*,
2024 WL 589090 (N.D. Cal. Feb. 13, 2024) ... 9, 16

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ... 19

*Burdette v. FuboTV Inc.*,
2024 WL 2831466 (N.D. Ill. June 4, 2024) ... 4, 5, 7

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ... 19, 22, 23

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ... 23

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) ... 9, 13, 19

*Collins v. Toledo Blade*,
720 F. Supp. 3d 543 (N.D. Ohio 2024) ... 5

*D'Angelo v. FCA US, LLC*,
726 F. Supp. 3d 1179 (S.D. Cal. 2024) ... 2, 19

*D'Angelo v. Penny OpCo, LLC d/b/a JCPenney*,
2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) ... 13, 14, 16

*Doe I v. Google LLC*,
2024 WL 3490744 (N.D. Cal. July 22, 2024) ... 12

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ... 2, 7

*Flowers v. Twilio, Inc.*,
2016 WL 11684603 (Super. Ct. Alameda Cnty. Aug. 2, 2016) ... 9

*Garcia v. Enter. Holdings, Inc.*,
78 F. Supp. 3d 1125 (N.D. Cal. 2015) ... 22

*Garcia v. Yeti Coolers, LLC*,
2023 WL 5736006 (C.D. Cal. Sept. 5, 2023) .................... 9

*Gladstone v. Amazon Web Servs.*,
2024 WL 3276490 (W.D. Wash. July 2, 2024) .................... 9, 12, 13

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) .................... 13

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) .................... 18

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .................... 15, 17

*In re Hulu Priv. Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .................... 4, 6

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .................... 20

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) .................... 2, 4, 6

*James v. Allstate Ins. Co.*,
2023 WL 8879246 (N.D. Cal. Dec. 22, 2023) .................... 13

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .................... 17

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) .................... passim

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) .................... 18, 21

*Johnson v. Blue Nile, Inc.*,
2021 WL 1312771 (N.D. Cal. Apr. 8, 2021) .................... 13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .................... 22

*Kishore v. Times Internet (UK) Ltd.*,
2024 WL 4197619 (N.D. Cal. Sept. 12, 2024) .................... 6

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) .................... 17

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) .................... 19

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) ........ 4

*M.K. v Google LLC*,
2023 WL 4937287 n.4 (N.D. Cal. Aug. 1, 2023) ........ 2

*Marden v. LMND Med. Group, Inc.*,
2024 WL 4448684 (N.D. Cal. July 3, 2024) ........ 13

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ........ 16

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) ........ 23

*Nayab v. Capital One Bank (USA), N.A.*,
942 F.3d 480 (9th Cir. 2019) ........ 2, 3

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........ 19, 21

*NovelPoster v. Javitch Canfield Group*,
140 F. Supp. 3d 938 (N.D. Cal. 2014) ........ 18

*Price v. Carnival Corp.*,
712 F. Supp. 3d 1347 (S.D. Cal. 2024) ........ 10, 19, 21

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024) ........ 4

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ........ 8, 18

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) ........ 2, 14, 15, 17

*Rodriguez v. Sony Computer Ent. Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) ........ 5

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) ........ 24

*Sadlock v. Walt Disney Co.*,
2023 WL 4869245 (N.D. Cal. July 31, 2023) ........ 20

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) ........ 7, 9, 15

*Saunders v. Hearst Television, Inc.*,
711 F. Supp. 3d 24 (D. Mass. 2024) ........ 4, 7

*Shah v. Fandom, Inc.*,
2024 WL 4539577 (N.D. Cal. Oct. 21, 2024) .......... 14, 16

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .......... 22

*Smith v. YETI Coolers, LLC*,
2024 WL 4539578 (N.D. Cal. Oct. 21, 2024) .......... 13, 21

*Sterk v. Redbox Automated Retail, LLC*,
2013 WL 4451223 (N.D. Ill. Aug. 16, 2013) .......... 5

*Strehl v. Guitar Center, Inc.*,
2023 WL 9700041 (C.D. Cal. Nov. 3, 2023) .......... 20

*Swarts v. Home Depot, Inc.*,
689 F. Supp. 3d 732 (N.D. Cal. 2023) .......... 11

*Tanner v. Acushnet Co.*,
2023 WL 8152104 (C.D. Cal. Nov. 20, 2023) .......... 11

*Tate v. VITAS Healthcare Corp.*,
2025 WL 50447 (E.D. Cal. Jan. 8, 2025) .......... 9, 12, 13

*Tavernetti v. Superior Ct.*,
22 Cal. 3d 187 (1978) .......... 8

*Turner v. Nuance Communications, Inc.*,
735 F. Supp. 3d 1169 (N.D. Cal. 2024) .......... passim

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) .......... 17

*Valenzuela v. Nationwide Mut. Ins. Co.*,
686 F. Supp. 3d 969 (C.D. Cal. 2023) .......... passim

*Valenzuela v. Super Bright LEDs Inc.*,
2023 WL 8424472 (C.D. Cal. Nov. 27, 2023) .......... 9, 13, 14

*Williams v. What If Holdings, LLC*,
2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) .......... 13

*Wright v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
2023 WL 5837492 (S.D. Cal. Sept. 8, 2023) .......... 17

*Yale v. Clicktale, Inc.*,
2021 WL 1428400 (N.D. Cal. Apr. 15, 2021) .......... 13

*Yockey v. Salesforce, Inc.*,
688 F. Supp. 3d 962 (N.D. Cal. 2023) .......... 9, 13, 23

*Yockey v. Salesforce, Inc.*,
2024 WL 3875785 (N.D. Cal. Aug. 16, 2024) .......... 11, 16, 17

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 10

**STATUTES**

18 U.S.C. § 2710(a) .......... 7

18 U.S.C. § 2710(b)(2)(D)(ii) .......... 5

Cal. Penal Code § 631 .......... 8, 9, 11

**OTHER AUTHORITIES**

S. Rep. No. 100–599 .......... 7

# INTRODUCTION

Defendant had the ability to determine what information was collected by Twilio and Mixpanel, the third parties at issue in this litigation. Compl. ¶¶ 34-36. Defendant could have chosen for that information to not identify its users, while still having the option to "analyze aggregate user behavior." RJN Ex. G at 2. Instead, Defendant put its pecuniary interests first and enabled third parties to collect its users PII. And Defendant did not take any half-measures either, instead disclosing as explicit PII as it possibly could to Twilio and Mixpanel: users' *full names*, the *full titles* of the videos they watched, and even *biological characteristics* like height and weight:

**Summary of Third-Party Exfiltration**

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Segment** | Video Title, Video ID | Full Name, Email (unhashed), Birthday, Gender, Height, Weight | User ID, IDFV |
| **Mixpanel** | Video Title, Video ID | Full Name, Email (unhashed), Birthday, Gender, Height, Weight | User ID |

Compl. ¶ 34.

These disclosures were not for some innocuous purpose either. Both Twilio and Mixpanel focus on creating comprehensive user profiles that encompass not just a user's activity on Defendant's App, but those same users' activities on other apps and websites. *Id.* ¶¶ 45-50, 75-76. Those profiles are then disclosed to Twilio and Mixpanel's other clients, or even further third parties like Google and Meta, for use in targeted advertising. *Id.* ¶¶ 50, 78-79. And, of course, Defendant is enriched through this process because its App users become even more valuable to advertisers when users' very revealing PII is conglomerated in these profiles. *See id.* ¶ 82 ("All of this … helps Defendant monetize the App and maximize revenue by collecting and disclosing as much information as possible…"). So, Defendant is allowing third parties to collect incredibly revealing information about Defendant's users, which those third parties can use to comprehensively track Defendant's users across the Internet, so Defendant can monetize its App.

Fortunately for consumers, at least two statutes stand in Defendant's way: the Video Privacy Protection Act ("VPPA") and the California Invasion of Privacy Act ("CIPA"). Both statutes were enacted to ensure consumers get to decide who does and does not get to know information about them. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (the VPPA "protects privacy interests more generally by ensuring that consumers retain control over their personal information"); *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was structured to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"). That control was absolutely lost when Defendant disclosed or otherwise enabled Twilio and Mixpanel to collect Plaintiff's and Class Members' PII. But thankfully for consumers, the text of both statutes and relevant caselaw overwhelmingly reject Defendant's interpretation of both statutes that would excuse Defendant's conduct. Defendant is not permitted to disclose PII to third parties for marketing and advertising purposes under the VPPA. *See*, *e.g.*, *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023). Defendant is not allowed to enable third parties to collect PII solely because those third parties are benefitting Defendant through that collection. *See*, *e.g.*, *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023). And Defendant cannot claim an ambiguous privacy policy on its *website* put users on Defendant's *App* on notice of the violations at issue. *See*, *e.g.*, *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1197 (S.D. Cal. 2024).

For the following reasons, the Court should deny Defendant's Motion.

## ARGUMENT

### I. DEFENDANT VIOLATED THE VPPA

#### A. Defendant Disclosed PII To Twilio And Mixpanel For Marketing, Advertising, And Analytics, Which Fall Outisde The Ordinary Course Of Business

Defendant does not dispute any element of Plaintiff's VPPA claim. Instead, Defendant contends its disclosures to Twilio and Mixpanel fell within "the ordinary course of business exception" to the VPPA. MTD at 18:19-21. But the ordinary course of business exception is an affirmative defense that Plaintiff is not required to plead around. *M.K. v Google LLC*, 2023 WL 4937287, at *6 n.4 (N.D. Cal. Aug. 1, 2023) (a plaintiff "has no duty to foreclose an ordinary course of business defense in his complaint"); *see also Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d

480, 494 (9th Cir. 2019) (holding "[t]he burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits") (cleaned up). Indeed, "[i]f the defendant wishes to rely upon the proviso, *the burden is upon it to bring itself within the exception*." *Nayab*, 942 F.3d at 495 (emphasis added, internal quotations and brackets omitted). So, it is actually Defendant who has to justify why its disclosures were subject to the ordinary course of business, not Plaintiff who has to allege why the disclosures were not. Defendant cannot do so.

As Plaintiff alleges, the purpose of Defendant's disclosures to Mixpanel and Twilio is to "analyze App data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant['s] revenue from their video-based marketing and advertising on the App." Compl. ¶ 72. For example, Defendant discloses App user PII to Twilio so Twilio can identify individuals and create comprehensive user profiles that foster better targeted advertising and marketing. *Id.* ¶¶ 73-74, 77, 81; *see also* RJN Ex. F at 5 ("Query your user profile in real time to build in-app recommendations … and create personalized marketing campaigns."); *id.* at 7 ("Deliver personalized, omnichannel campaigns to realtime targeted audiences…"). Twilio then further discloses PII to other third parties for targeted advertising, such as Meta, Google, and Salesforce. *Id.* ¶ 78. For instance, "[w]hen Twilio transmits PII to Facebook … it sends an expanded list of identifiers or traits to Facebook, so that Facebook can try to use these additional datapoints to match to their user profiles. The same goes for Google, with Twilio helping developers run advertising campaigns without having to manually update the list of users to target in Adwords campaigns." *Id.* ¶ 79 (cleaned up).

Similarly, Defendant discloses App user PII to Mixpanel so Mixpanel can create comprehensive user profiles composed of user's identifying information and their interactions with the App. *Id.* ¶¶ 41, 45-46. In fact, Mixpanel can track users "across different apps, allowing Mixpanel to create detailed profiles of consumer activity." *Id.* ¶ 49. "This tracking makes Mixpanel's 'user profiles' more valuable to future clients because they contain unified details of user activity across many apps used by an individual." *Id.* ¶ 50. Those comprehensive user assist Defendant's "marketing, advertising, and analytics." *Id.* ¶ 85. And Mixpanel "use[s] IP address to

enrich events with geographic information like city, country, and region," thus adding additional identifying information on top of the information Defendant already discloses to it. RJN Ex. G at 2.

Courts have held disclosures to Twilio through the Segment SDK fall outside the ordinary course of business. *Rancourt v. Meredith Corp.*, 2024 WL 381344, at *17 (D. Mass. Feb. 1, 2024) (finding disclosures to Twilio fell outside the ordinary course of business because the "model of deriving revenue from targeted advertising goes beyond the management and operations of the business to … a purely pecuniary end"). And in general, courts have held that where, as here, Defendant discloses PII to third parties "to collect analytical data about how users use its [App] and, in turn … target more specific ads to their users, which permits [Defendant] to increase profits," such disclosures fall outside the ordinary course of business. *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023) (cleaned up); *see also*, *e.g.*, *Ade v. Viki, Inc.*, 2024 WL 1880153, at *3 (N.D. Cal. Mar. 28, 2024) ("The complaint alleges that Viki uses the Pixel to track visitor actions on its website and to better target their products and services on Facebook to interested consumers, thereby increasing its profits … The Court cannot find as a matter of law based on the allegations of the complaint that the purpose of this data-sharing arrangement falls within the ordinary course of business exception."); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012) ("Market research and web analytics are not in the ordinary course of Hulu's business of delivering video content to consumers."); *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024) ("The alleged uses of the information here – marketing, advertising, and analytics – do not fall within the exception's narrow list of permissible uses.") (cleaned up); *Burdette v. FuboTV Inc.*, 2024 WL 2831466, at *5 (N.D. Ill. June 4, 2024) ("As targeted marketing and advertising analytics have only ballooned in complexity and pervasiveness … 'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities."); *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (finding disclosures "to measure analytics and increase advertising revenue … do not fall into the narrow categories statutorily defined as the 'ordinary course of business'").

Indeed, the VPPA *explicitly regulates* disclosures made for "marketing goods and services directly to the consumer," if the disclosure only includes "the subject matter of such materials"—

which here, it does not. 18 U.S.C. § 2710(b)(2)(D)(ii); *see also* Compl. ¶¶ 34-36 (showing disclosures of the full names of video titles). "If Congress intended to include 'marketing' … where it discussed the 'ordinary course of business,' then it would have done so, and perhaps would not have also addressed 'marketing' in its own subsection." *Collins v. Toledo Blade*, 720 F. Supp. 3d 543, 554-55 (N.D. Ohio 2024). Thus, it cannot be that marketing activities fall within the ordinary course of business. And while the legislative history refers to "mailing houses," "warehouses," and "similar companies," this makes sense because such companies are passive repositories of information and automated distributors to receive customer records. But these third parties may not become involved with analyzing those records or targeting groups with those materials, which is what Plaintiff alleges Twilio and Mixpanel do here.

**B. Defendant's Arguments Are Unpersuasive**

In support of its arguments, Defendant cites two authorities: *Sterk v. Redbox Automated Retail, LLC*, 2013 WL 4451223 (N.D. Ill. Aug. 16, 2013), *aff'd*, 770 F.3d 618, 624 (7th Cir. 2014); and *Rodriguez v. Sony Computer Ent. Am., LLC*, 801 F.3d 1045 (9th Cir. 2015). Both are inapposite. In *Sterk*, 2013 WL 4451223, at *4, the defendant disclosed PII to a third party for "customer support services" or "to respond to customer service requests." That is a far cry from the purpose of Defendant's disclosures here. Indeed, as more recent courts in the Seventh Circuit have recognized, *Sterk* holds that "advertising does not fall within VPPA's 'ordinary course of business' exception," and that "'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities." *Burdette*, 2024 WL 2831466, at *5.

*Rodriguez* is even more off point. In that case, a disclosure was made by "Sony Computer … to Sony Network." *Rodriguez*, 801 F.3d at 1054 (cleaned up). Thus, *Rodriguez* involved "intra-corporate disclosures" between two Sony entities, not the disclosure of information to unrelated third parties as alleged here. Compl. ¶¶ 32-33.

Defendant also argues "the Complaint does not plausibly allege the underlying purpose for which Aaptiv uses Segment and Mixpanel." MTD at 19:4-5. On the contrary, the Complaint clearly alleges the purposes for which Defendant discloses PII to Twilio and Mixpanel, as noted above. Argument § I.A, *supra*. And "[t]o the extent [Defendant] challenges [Plaintiff's] factual allegations

regarding the purpose of [Defendant's] data-sharing practices, that factual issue is not appropriate for resolution on a motion to dismiss." *Jackson*, 2023 WL 4670285, at *5; *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *7 ("Whatever the merits are to [defendant's] contentions [regarding the purpose of data-sharing], [p]laintiffs allege unauthorized tracking of [their] data (including video content information). The court cannot resolve this factual issue in a motion to dismiss."); *Kishore v. Times Internet (UK) Ltd.*, 2024 WL 4197619, at *2 (N.D. Cal. Sept. 12, 2024) ("Plaintiffs do not yet have access to specific information about how … Defendant used the Pixel. The Court declines the invitation to decide a factual dispute at the heart of Plaintiffs' case…"); *Turner v. Nuance Communications, Inc.*, 735 F. Supp. 3d 1169, 1184 (N.D. Cal. 2024) ("To ask a plaintiff to plead with great particularity exactly what a third-party software company is capable of doing with data gathered from defendant's website sets the pleading bar too high.") (cleaned up).

Defendant's challenge is also undermined by its own cited materials.[1] Defendant's cited materials on Twilio state that Twilio can "build in-app recommendations," "create personalized marketing campaigns," "[d]eliver personalized, omnichannel campaigns to realtime targeted audiences," and create unified customer profiles, just as Plaintiff alleges. *Compare* RJN Ex. F at 4-5, 7; *with* Compl. ¶¶ 73-82. As to Mixpanel, Defendant's citations state Mixpanel creates user profiles and "enables you to track how users engage with your product and analyze this data with interactive reports," which is also consistent with Plaintiff's allegations. *Compare* RJN Ex. H at 1, 3-4; *with* Compl. ¶¶ 40-50, 83-85. Notably, Mixpanel states it *does not need to know* "any identifying information about users (like email or phone number)" to perform its analytics services. RJN Ex. G at 2. Thus, Defendant could have simply disclosed "aggregate user behavior [to Mixpanel] without being able to drill down into any particular user." *Id*. Instead, Defendant disclosed highly revealing PII (users' full names and e-mail address) and even biological characteristics like height and weight.

---

[1] Notwithstanding this, Defendant's cherry-picked quotations from the Twilio and Mixpanel websites are not properly subject to judicial notice because Plaintiff does not cite any of these URLs in the Complaint. And Defendant's cited quotations do not undermine or contradict Plaintiff's allegations, which must be construed as true at this stage. At best, they create questions of fact that cannot be resolved at this stage.

Compl. ¶¶ 34, 36. Such disclosures cannot possibly fall within the ordinary course of business when Mixpanel itself states it does not need such revealing information to perform its services.

Last, Defendant argues that because Twilio and Mixpanel are receiving PII to support Defendant, such disclosures fall within the ordinary course of business exception. *See* MTD at 19:11-13. The "narrow" ordinary course of business exception permits disclosures for "only debt collection activities, order fulfillment, request processing, and the transfer of ownership." *Saunders*, 711 F. Supp. 3d at 32 (quoting 18 U.S.C. § 2710(a)). Nothing in that text also includes an exception for when the third party is acting "at the direction and for the benefit of" Defendant. *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021) (rejecting similar argument in case CIPA § 631 and noting "FullStory did not become a 'party' to the communication simply because it was providing recording and transmission services for Nike"); *Turner*, 735 F. Supp. 3d at 1186 ("The statute does not contain the limiting language Nuance wants to read into it—i.e., that the statute prohibits use, except if the purpose of the use is to benefit a party to the communication.").

The VPPA is about retaining control of who does and does not get to know what videos are watched by which specific individuals. *Eichenberger*, 876 F.3d at 983 ("[T]he statute also protects privacy interests more generally by ensuring that consumers retain control over their personal information."); S. Rep. No. 100–599 at 6-7 (1988) ("Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes."). That control is lost when PII is disclosed to a third party without notice or consent—and especially when it is disclosed to even further third parties for targeted advertising (Compl. ¶¶ 46-50, 78-79), or in cases where such disclosures are not even necessary for the third party's services (RJN Ex. G at 2). And preserving that control is especially important "[a]s targeted marketing and advertising analytics have only ballooned in complexity and pervasiveness." *Burdette*, 2024 WL 2831466, at *5. Thus, the statute's protections are violated equally when a third party receives PII—whether or not it is acting "at the direction and for the benefit of" Defendant—and indeed, Defendant "invite[s] an interpretation that would vitiate the statute's protections." *See Saleh*, 562 F. Supp. 3d at 520.

## II. DEFENDANT VIOLATED CIPA § 631 BY AIDING, AGREEING WITH, EMPLOYING, OR OTHERWISE ENABLING THE WIRETAPPING

Defendant does not dispute that it can be held liable for aiding, agreeing with, and employing Twilio's and Mixpanel's wiretapping in violation of the fourth clause of CIPA § 631. *See*, *e.g.*, *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Although Moosejaw cannot be liable for eavesdropping on its own communications with Revitch, the complaint adequately alleges that Moosejaw violated section 631 by enabling NaviStone's wrongdoing."). Instead, Defendant argues that it cannot be held liable because Plaintiff does not adequately allege that Twilio and Mixpanel violated either the second or third clause of CIPA § 631. MTD at 17:22-25. This is wrong.

CIPA § 631 imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). As relevant here, the second clause of CIPA § 631 prohibits someone from:

> [w]illfully and without the consent of all parties to the communication … read[ing] or attempt[ing] to read or learn[ing] the contents or meaning of any … communication while the same is in transit … or is being sent from or received at any place within [California].

Cal. Penal Code § 631(a). The third clause of CIPA § 631 prohibits someone from "us[ing], or attempt[ing] to use, in any manner, or for any purpose" any wiretapped information. *Id*. Plaintiff adequately alleges Twilio and Mixpanel violated these clauses of the CIPA. Thus, Plaintiff also states a claim against Defendant for aiding, agreeing with, and employing these violations.

### A. Twilio And Mixpanel Were Third-Party Wiretappers To Plaintiff's Communications With The App

Defendant argues Plaintiff cannot state a claim under the second clause of CIPA § 631(a) claim because Twilio and Mixpanel are allegedly "acting as 'extensions of' Aaptiv." MTD at 11:4-5. In other words, Defendant argues, there can be no CIPA violation because Twilio and Mixpanel were not "third parties" to Defendant's communications with its users like Plaintiff.

As to Twilio, at least one California state court has addressed a CIPA § 631 claim against Twilio and found Twilio was a third party wiretapper:

> Contrary to Twilio's characterization of the complaint, the complaint makes clear that it is Twilio, not its clients, that recorded

> the communications, and thus Twilio had possession and control of the contents of the communications, which it disclosed to its clients on request. The allegations are not, as Twilio asserts, that Twilio simply provided a software product that third parties misused.

*Flowers v. Twilio, Inc.*, 2016 WL 11684603, at *1 (Super. Ct. Alameda Cnty. Aug. 2, 2016); *see also*, *e.g.*, *Saleh*, 562 F. Supp. 3d at 520 ("FullStory is a separate legal entity that offers 'software-as-a-service' and not merely a passive device."); *see also*, *e.g.*, *Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 981 (C.D. Cal. 2023) ("[A] plausible inference from Valenzuela's allegations is that Akamai—a corporate entity wholly distinct from Nationwide—is a third party learning the contents of communications in real time.").

More broadly, and as explained in more detail below, courts are generally split into two camps regarding whether a software-as-a-service ("SaaS") provider is a third-party wiretapper for the purposes of CIPA § 631. The better-reasoned approach—the "capability" approach—supports that Twilio and Mixpanel are third-party wiretappers. Defendant's proffered interpretation, meanwhile—the "extension" approach—has no basis in the text, caselaw, and legislative policy behind CIPA § 631 and should be rejected. But even under this interpretation, Plaintiff has sufficiently alleged Twilio and Mixpanel are third-party wiretappers.

*1. Twilio And Mixpanel Are Third-Party Wiretappers Under The "Capability" Approach, Which The Court Should Adopt*

As a "growing number of district courts" have held (*Turner*, 735 F. Supp. 3d at 1184), an SaaS provider is a "third party" under CIPA § 631(a) if the SaaS provider "ha[s] the *capability* to use its record of the interaction for any other purpose ([unlike] a tape recorder [that] has no independent capability to divulge the recording for any other purpose but that of its owner)." *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023) (emphasis in original); *see also*, *e.g.*, *Yockey v. Salesforce, Inc.*, 688 F. Supp. 3d 962, 972-73 (N.D. Cal. 2023); *Balletto v. Am. Honda Motor Co.*, 2024 WL 589090, at *3 (N.D. Cal. Feb. 13, 2024); *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1002 (N.D. Cal. 2024); *Tate v. VITAS Healthcare Corp.*, 2025 WL 50447, at *4 (E.D. Cal. Jan. 8, 2025); *Valenzuela v. Super Bright LEDs Inc.*, 2023 WL 8424472, at *7 (C.D. Cal. Nov. 27, 2023); *Gladstone v. Amazon Web Servs.*, --- F. Supp. 3d ---, 2024 WL 3276490, at *6 (W.D. Wash. July 2, 2024); *Garcia v. Yeti Coolers, LLC*, 2023 WL 5736006, at *3 (C.D. Cal. Sept. 5, 2023) (noting

"courts have posited that companies like ASI are separate corporate entities more accurately analogized to the eavesdropper in *Ribas*" because "the alleged capabilities of [web monitoring] software are beyond the ordinary function of a tape recorder") (internal quotations omitted). The "capability" approach does not require that the SaaS provider actually use the data for another purpose in the instant action, only that the SaaS provider can do so. *Javier*, 649 F. Supp. 3d at 900 (SaaS provider was a third party where "Active Prospect can use that information for other purposes, even if Javier has not alleged that they have done so in this case").

Applying the "capability" approach, Plaintiff's allegations suffice to show Twilio and Mixpanel are third-party eavesdroppers. As Plaintiff alleges, Twilio and Mixpanel have the capability to use the wiretapped conversations for a number of purposes other than simply regurgitating the contents to Defendant, including but not limited to:

**Twilio**

- Creating "unified customer profiles by taking event data from across devices and channels and intelligently merging it into complete user- or account-level profiles." Compl. ¶ 73 (cleaned up).
- Incorporating user information from sources other than Defendant's App into the user's profile. *Id.* ¶ 75.
- Disclosing PII to even further third parties like Meta, Google, and Salesforce for targeting advertising campaigns. *Id*. ¶¶ 78-79.

**Mixpanel**

- Creating comprehensive user profiles, including by tracking "specific users across different apps." *Id.* ¶¶ 45, 47-49.
- Sharing those user profiles with clients other than Defendant for use in targeted advertising, which enriches Mixpanel because these profiles "contain unified details of user activity across many apps used by an individual." *Id.* ¶ 50.
- "[U]s[ing] IP address to enrich events with geographic information like city, country, and region." RJN Ex. G at 2.

These allegations make clear that Twilio and Mixpanel have the capability to "capture[], store[], and interpret[] [] real-time data—which extends beyond the ordinary function of a tape recorder." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021); *see also, e.g.*, *Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1355 (S.D. Cal. 2024) ("Because generating heatmaps and fingerprinting unique browser profiles extends beyond the function of a tape recorder,

the party to the communication exception does not prevent Carnival from being held liable…") (cleaned up); *Yockey v. Salesforce, Inc.*, --- F. Supp. 3d ---, 2024 WL 3875785, at *4 (N.D. Cal. Aug. 16, 2024) (finding SaaS was a third party where, among other things, it could "analyze Chat communications to assist with customer service interactions and data analytics"); *Javier*, 649 F. Supp. 3d at 900 (SaaS provider was a third party where "Javier pleads that ActiveProspect monitors, analyzes, and stores information about visits to Assurance's websites"); *Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969 (finding that "software that allows a third party to capture messages in real time and later perform data analysis" should qualify as a third-party wiretapper); *Turner*, 735 F. Supp. 3d at 1185 (same where SaaS provider "enrolls [] voice prints into a database of voice prints, and then compares the voice characteristics of later callers against its saved voice prints"); *Tanner v. Acushnet Co.*, 2023 WL 8152104, at *5 (C.D. Cal. Nov. 20, 2023) (same where "Plaintiff also alleges that the Session Replay Providers cross-reference and analyze user activity across all the websites they monitor").[2]

Defendant does not actually grapple with this prevailing view, but it makes a few arguments that can be easily disposed of. *First*, Defendant contends that "any data shared with these vendors is owned exclusively by Aaptiv and not sold to third parties." MTD at 12:13-14. Of course, the vendors themselves are third parties, so this is a red herring. Regardless, whether data is literally *sold* is irrelevant to whether that data is *shared* or otherwise *provided* by Twilio and Mixpanel to other third parties in the form of user profiles for targeted advertising and comprehensive tracking, as Plaintiff alleges. *See*, *e.g.*, Compl. ¶¶ 45-50, 73-80.

*Second*, whether Defendant owns the information Twilio and Mixpanel collect is irrelevant. The fact an SaaS provider "obtains no rights to a customer's content" does not absolve it of liability, as the argument incorrectly interprets CIPA § 631 "based on the intentions and usage of the software provider," and Plaintiff alleges Twilio and Mixpanel "ha[ve] capabilities beyond that of a mere tape

[2] In *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 745 (N.D. Cal. 2023), by contrast, the third party did not satisfy the "capability" test because it was only "providing Home Depot customer data metrics related to each conversation." This is a far cry from the allegations here, where Twilio and Mixpanel are creating comprehensive user profiles that are being provided to other third parties and clients, not just Defendant.

recorder" in any event. *Gladstone*, 2024 WL 3276490, at *6. In other words, whether Defendant continues to "own" the data is irrelevant to whether the data was collected by Twilio and Mixpanel because it does not matter whether Twilio and Mixpanel were collecting the data for themselves or for Defendant. And Twilio and Mixpanel have the capability to use App users' PII for various purposes beyond Defendant's, regardless of who owns that data.

*Finally*, Defendant argues "the Complaint generally alleges what these vendors can be used for … but offers no factual allegations as to how Aaptiv actually uses these vendors in this case." MTD at 12:6-7. Aside from not being true (Compl. ¶¶ 37-50, 73-85), Defendant's argument is irrelevant because the "capability" analysis only requires Plaintiff to allege that Twilio and Mixpanel "can use [] information for other purposes, even if [Plaintiff] has not alleged that they have done so in this case." *Javier*, 649 F. Supp. 3d at 900; *see also Tate*, 2025 WL 50447, at *5 ("[W]hether Invoca actually uses the contents of the call for its own purposes is not legally relevant."). Further, it is impossible for Plaintiff to know with certainty at this stage what goes on behind the curtain. *Turner*, 735 F. Supp. 3d at 1184 ("To ask a plaintiff to plead with great particularity exactly what a third-party software company is capable of doing with data gathered from defendant's website sets the pleading bar too high."). Plaintiff's allegations are enough to raise a plausible inference that Twilio and Mixpanel are third parties that are capable of using the wiretapped information for a purpose other than regurgitating information. That is sufficient at this stage.[3]

2. *Twilio And Mixpanel Are Third-Party Wiretappers Under The "Extension" Approach, Which The Court Should Reject*

Defendant's primary argument is that Twilio and Mixpanel are "'extensions of' Aaptiv," rather than third party wiretappers. MTD at 11:3-5. This "extension" approach to interpreting CIPA

[3] In *Doe I v. Google*, by contrast, the plaintiffs could not even allege whether the "Google source code is being placed on particular web pages," and did not allege what information was actually disclosed to Google in such instances. *Doe I v. Google LLC*, --- F. Supp. 3d ---, 2024 WL 3490744, at *3 (N.D. Cal. July 22, 2024); *see also id.* ("[T]he plaintiffs repeatedly allege that data sent to Google 'may include' specific information like patient device identifiers or search terms … The use of this type of indefinite language makes it unclear what are true factual allegations and what is just speculation."). It was therefore telling that the plaintiffs did not allege "they ever saw [targeted] advertisements" because they could not allege their information was disclosed at all. *Id.*, at *3. But here, Plaintiff specifically alleges that Twilio and Mixpanel are incorporated in the App, what specific information Twilio and Mixpanel collect from App users and under what conditions, that Plaintiff's information was so collected, and why Twilio and Mixpanel are collecting that information. *See*, *e.g.*, Compl. ¶¶ 27-28, 32-36, 45-50, 73-82, 86-87, 96-97.

§ 631(a) was first postulated by *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823 (N.D. Cal. 2021), and other cases that have followed it. *See*, *e.g.*, *Williams v. What If Holdings, LLC*, 2022 WL 17869275 (N.D. Cal. Dec. 22, 2022); *James v. Allstate Ins. Co.*, 2023 WL 8879246 (N.D. Cal. Dec. 22, 2023).[4] That approach holds that an SaaS provider is not a third party wiretapper where it does not "intercept[] and use[] the data itself," and instead "provides a tool … that allows [a website or app developer] to record and analyze its own data in aid of [the website or app developer's] business." *Graham*, 533 F. Supp. 3d at 832. As an initial matter, Plaintiff alleges Twilio and Mixpanel do intercept and use the information themselves, by compiling comprehensive user profiles that include information from more than just Defendant's App, and disclosing those same user profiles to other clients and entities that are not Defendant for targeted advertising. Compl. ¶¶ 47-50, 75, 78-79. These allegations satisfy the "extension" approach because Twilio and Mixpanel "intercepted and used the data [themselves]" "to monetize and market their services." *Graham*, 533 F. Supp. 3d at 832; *Smith v. YETI Coolers, LLC*, --- F. Supp. 3d ---, 2024 WL 4539578, at *3 (N.D. Cal. Oct. 21, 2024) (cleaned up); *Marden v. LMND Med. Group, Inc.*, 2024 WL 4448684, at *3 (N.D. Cal. July 3, 2024) ("Plaintiffs allege that Google and Facebook benefited from this interception by using the information to sell ads to other third-party advertisers.").

Regardless, a growing number of courts have rejected the "extension" approach as "based on a misinterpretation of Section 631 and *Ribas*, both of which compel the conclusion that the third party's intentions with respect to the use of the collected information are irrelevant." *Yockey*, 688 F. Supp. 3d at 972; *see also*, *e.g.*, *Javier*, 649 F. Supp. 3d at 900 (rejecting "extension" approach); *Turner*, 735 F. Supp. 3d at 1184 (same); *Cody*, 718 F. Supp. 3d at 1002; *Balletto v. Am. Honda Motor Co.*, 2023 WL 7026931, at *2 (N.D. Cal. Oct. 24, 2023) (same); *Tate*, 2025 WL 50447, at *4 (same); *Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969 (same); *Super Bright LEDs Inc.*, 2023 WL 8424472, at *7 (same); *Gladstone*, 2024 WL 3276490, at *6 (same); *D'Angelo v. Penny OpCo, LLC d/b/a*

---

[4] Two of the decisions Defendant cites were issued by the same judge as *Graham* and at around the same time. *Yale v. Clicktale, Inc.*, 2021 WL 1428400 (N.D. Cal. Apr. 15, 2021); *Johnson v. Blue Nile, Inc.*, 2021 WL 1312771 (N.D. Cal. Apr. 8, 2021).

*JCPenney*, 2023 WL 7006793, at *7-8 (S.D. Cal. Oct. 24, 2023) (same). This Court should do the same.

*First*, the "extension" approach defies the text of CIPA § 631, which controls as to statutory interpretation. *Shah v. Fandom, Inc.*, --- F. Supp. 3d ---, 2024 WL 4539577, at *3 (N.D. Cal. Oct. 21, 2024) ("[T]he Court's analysis must begin with the statutory text, and if that text is clear, must end there."). Specifically, the "extension" approach "interprets the second prong of the statute"—which penalizes "reading" communications—"based on the intentions and usage of the prospective third party." *Javier*, 649 F. Supp. 3d at 900. And "the third prong of the statute already penalizes 'use.'" *Id*. "Thus, reading a use requirement into the second prong would add requirements that are not present (and swallow the third prong in the process)." *Id.*; *see also JCPenney*, 2023 WL 7006793, at *7-8 ("A use requirement is more appropriate in a Clause Three, not Clause Two … To plausibly allege a violation of Clause Two, [plaintiffs] need not allege that Vergic [conducted wiretapping] for its own use."); *Super Bright LEDs Inc.*, 2023 WL 8424472, at *7 ("The determination … that a violation of the second clause could occur only when the information in the communication was actually used by the vendor, are not based on the actual language of the statute.").

Further, CIPA § 631(a) penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" to conduct wiretapping. In other words, CIPA § 631 not only prohibits wiretapping by a third party like Twilio and Mixpanel, but also prohibits a party to the communication, such as Defendant, from allowing Twilio and Mixpanel to wiretap *on Defendant's behalf*. The "extension" approach is thus contrary to this plain text as well, as it would exempt an employer who asks his or her employee to conduct wiretapping. And because it is contrary to the text of CIPA § 631, the "extension" approach cannot be adopted.

*Second*, in *Ribas*, the California Supreme Court "did not consider the wife's friend's intentions or the use to which they put the information they obtained." *Javier*, 649 F. Supp. 3d at 900. "Instead, [*Ribas*] emphasized the privacy concerns at issue with having an unannounced second auditor listening in on the call." *Id.* (cleaned up). Indeed, *Ribas* went as far as to contemplate liability under CIPA § 631 for an employer who "*request[s] a secretary to secretly transcribe a conversation over an extension*," even though the secretary would be doing the recording solely for the benefit of

his or her employer. *Ribas*, 38 Cal. 3d at 361 (emphasis added). The "extension" approach, however, would have exempted the friend and the hypothetical secretary, as they were simply wiretapping for the benefit of the wife and their employer respectively. But that is not what the California Supreme Court held. Moreover, the California Supreme Court expressly held CIPA § 631 was enacted to prevent eavesdropping by "an unannounced second auditor, whether that auditor be a person *or mechanical device*." *Ribas*, 38 Cal. 3d at 360-61 (emphasis added). Under the "extension" approach, the "mechanical device" auditor would not be an eavesdropper, which also goes against *Ribas*. *See also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("[T]he Wiretap Act's legislative history evidences Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or 'an unseen auditor.' Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule.") (internal citations omitted).

*Third*, as courts have noted:

> [The "extension" approach w]ould imply that any third party who surreptitiously recorded a conversation between two parties would not violate § 631(a) so long as it was recording the conversation at the direction and for the benefit of a party. The text of section 631(a), however, does not contain any such exception, and indeed, [Defendant] invite[s] an interpretation that would vitiate the statute's protections.

*Saleh*, 562 F. Supp. 3d at 520; *Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 980 ("Eavesdropping on a conversation at the time it occurs is a violation of Section 631, even if done for the benefit of a party to the conversation."). In other words, adopting the "extension" approach would undermine CIPA's purpose of preventing the dissemination communications to an unannounced second auditor (*see Ribas*, 38 Cal. 3d at 360-61), as it would allow any third party to escape liability so long as it was acting on behalf of a party. On top of this, the "extension" approach permits innumerable technology companies to possess the communications of Californians simply because they were paid by others to do so, thus costing Californians "the right to control the nature and extent of the firsthand dissemination of [their] statements." *Ribas*, 38 Cal. 3d at 361. This also undercuts the purpose of CIPA, which is to be "interpret[ed] … in the manner that fulfills the legislative purpose of CIPA by

giving greater protection to privacy interests." *Shah*, 2024 WL 4539577, at *4. Given this, the Court must adopt the "capability" approach over the "extension" approach because "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

**B. Twilio And Mixpanel Intercepted The Communications In Transit**

Defendant argues "there are no plausible, factual allegations that Plaintiff's communications were actually intercepted in transit or before reaching Aaptiv, the intended recipient" because "that the data is sent to Segment/Mixpanel only *after* a user views a video on the app and *after* signing up for [an] a[c]count, by which time the personal information has already been entered on the Aaptiv app." MTD at 14:26-15:9 (emphasis in original). Defendant reads the Complaint and the law too narrowly.

Plaintiff alleges that "*when a user watches a video* on the App," their PII is disclosed to Twilio and Mixpanel (provided they have created an account first). Compl. ¶ 54 (emphasis added); *see also*, *e.g.*, *id.* ¶¶ 35-36; *id.* ¶ 58 ("[T]he dynamic analysis was conducted while a video … was played on the App. As demonstrated below, this title is a video provided by Aaptiv and the title of that video was disclosed to Twilio and Mixpanel."); *id.* ¶ 59 ("This network traffic is transmitted when, and only when a user actually watches a video."). In other words, Plaintiff alleges Twilio and Mixpanel acquire users' PII at the time a user actually watches a video. These allegations are again bolstered by Defendant's own materials, which state that Twilio "[t]rack[s] every interaction in real time." RJN Ex. F at 3; *see also Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 979 ("[Plaintiffs] did not simply recite that there was real time interception, she added detail on how it occurs … and pointed to statements from Defendant regarding real-time insights and data from every use event collected as it happens.") (cleaned up).

These allegations are sufficient to allege an in-transit interception because Twilio and Mixpanel are receiving this information "simultaneously with" Defendant. *See Yockey*, 2024 WL 3875785, at *5 (citing *JCPenney*, 2023 WL 7006793, at *8); *see also*, *e.g.*, *Balletto*, 2024 WL 589090, at *2 (in-transit interception alleged because "when [plaintiff] used the chat function the

defendant simultaneously routed chat messages through a third party's servers"); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 962 (N.D. Cal. 2023) (in-transit interception alleged where "once BlueKai is on the device, it then begins to intercept communications when the user makes communications to the website") (cleaned up); *Wright v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2023 WL 5837492, at *6 (S.D. Cal. Sept. 8, 2023) (communications intercepted "in transit" where "Wright's communications still traveled their normal path between her device and Ulta's servers, but the communications were tapped and copied and sent to Quantum's servers as well, unbeknownst to her") (cleaned up); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 607 (agreeing with Seventh Circuit that where "copies were sent contemporaneously with the original emails, the defendant had intercepted the communications and could be held liable") (citing *United States v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010)).

Defendant contends that because users must necessarily create an account to watch videos, Defendant is receiving account users' names, e-mail address, and other identifying information before Twilio and Mixpanel, and there can be no in-transit interception as such. *See* MTD at 15:7-13. This argument does not address the video-viewing information, which could only be collected by Twilio and Mixpanel "simultaneously with" Defendant and not at the account-creation step. *See Yockey*, 2024 WL 3875785, at *5. Regardless, the relevant inquiry is whether information is repeated "secondhand" as opposed to being "simultaneous[ly] disseminat[ed]." *See Ribas*, 38 Cal. 3d at 360. And here, the allegations are that as a user communicates with App (watches a videos), their PII is disclosed to Twilio and Mixpanel simultaneously with Defendant. There are no allegations that Defendant stops the transmission and discloses it at a much later time, and it does not matter whether Defendant also received the identifying information at a different step. The information just cannot be in "electronic storage" when acquired. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002) ("[F]or a website such as Konop's to be 'intercepted' in violation of the Wiretap Act, it must be acquired during transmission, not while it is in electronic storage.").

Defendant's argument also makes no sense. Imagine a situation where a consumer calls an operator and the operator then asks the consumer to provide sensitive information over the phone. The operator then connects a random third-party auditor to the call—unknown to the consumer—

and asks the consumer to repeat the contents of that conversation, which the auditor records. It cannot be the law that the operator is absolved of wiretapping because he or she learned those details at some prior time. Instead, the relevant inquiry is whether, at some point, there is a communication where an unannounced auditor (Twilio and Mixpanel) learns the contents at least at the same time as a party (Defendant).

Last, Defendant believes that, "[g]iven the speed of internet communications, CIPA's application to 'electronic communication is undoubtedly limited.'" MTD at 13:22-23 (quoting *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 938, 953 (N.D. Cal. 2014)). The Ninth Circuit, in addition to numerous district courts, disagree. *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications."); *Revitch*, 2019 WL 5485330, at *2 ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications, so there is no reason to consider the first part of an electronic communication beyond the statute's reach."). There are certainly instances where CIPA may not apply to Internet communications, but that is not the case here.[5]

### C. Twilio And Mixpanel Used The Intercepted Communications

Defendant argues "the Complaint does not include any factual allegations that Plaintiff's data was actually used by Aaptiv, Segment, or Mixpanel in any way." MTD at 17:13-14. On the contrary, Plaintiff alleges Twilio and Mixpanel used Plaintiff's PII "to create a user profile that Plaintiff's activity on the App, which Defendant uses for marketing, advertising and analytics purposes." Compl. ¶¶ 96-97. And Plaintiff alleges that the user profiles created by Twilio and Mixpanel are conglomerated with information about those users from others websites and apps and provided to even further third parties for advertising. *Id.* ¶¶ 45-50, 75-79. It also does not matter whether Twilio

[5] In *NovelPoster*, 140 F. Supp. 3d at 952, by contrast, "the plaintiffs alleged the defendant accessed emails from plaintiffs after they had "already been received in an email account's inbox." Thus, the plaintiffs there alleged the communications completely came to a halt and were in electronic storage before being disclosed. Not so here. Indeed, courts have even found that an in-transit interception occurs where a "communication in temporary, transient storage as part of the transmission process is … intercepted." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1079 (N.D. Cal. 2015).

and Mixpanel are using that information for their own benefits or for Defendant's. *Turner*, 735 F. Supp. 3d at 1186 ("The statute does not contain the limiting language Nuance wants to read into it—*i.e.*, that the statute prohibits use, except if the purpose of the use is to benefit a party to the communication."). On the contrary, "[a] broad reading of 'use' is supported by the case law." *Id*. Thus, Plaintiff has sufficient alleged Twilio and Mixpanel used the intercepted communications, and that Defendant aided, agreed with, and employed that conduct. *Id.*; *see also Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d at 979.

**D. Defendant Has Not Met Its Burden To Show That Plaintiff And Class Members Consented To The Wiretapping**

Last, Defendant argues "there can be no eavesdropping here where users consent to any disclosure." MTD at 15:16-17. To wit, Defendant contends that because its Privacy Policy ostensibly "informs users" of the data collection, "the Complaint does not and cannot plausibly allege a lack of consent." *Id.* at 16:6, 16:23-24. "[C]onsent is an affirmative defense for which defendant bears the burden of proof." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1148 (9th Cir. 2024) (cleaned up); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 926 n.13 (N.D. Cal. 2023) ("The Court finds, again, that consent is a defense to plaintiffs' claims and it is therefore on Google, not plaintiffs, to prove.") (cleaned up); *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021) ("The party seeking to establish consent has the burden of proof."). Defendant has not met that burden.

*1. Defendant Has Not Shown Plaintiff And Other Class Members Were On Notice Of Or Consented To The Wiretapping*

As an initial matter, Defendant contends that "Plaintiff and other users … express[ly] consent[ed]" to Defendant's Privacy Policy, and therefore, the disclosure of their PII. MTD at 16:4-5. But "merely having a privacy policy online" is insufficient "to show consent under CIPA." *Cody*, 718 F. Supp. 3d at 1000; *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1197 (S.D. Cal. 2024) ("Privacy policies, however, do not bind users 'where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent.'") (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1778-79 (9th Cir. 2014)). Instead, Defendant must demonstrate that users were on notice of and unambiguously assented to that Privacy Policy. *Price*, 712 F. Supp. 3d at 1358

("Where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.") (cleaned up). And to do that, Defendant must submit the design and content of the portion of the App where users were notified of and assented to that Privacy Policy.

Defendant has not done so, instead submitting the design and content of select pages of its *website*. RJN Exs. A-C. But what the website looked like is irrelevant to the design and content of the *App*, which Plaintiff alleges he used and which is the basis for his claims. Compl. ¶¶ 34-36, 86-88, 96-97.[6] Thus, under binding Ninth Circuit precedent, Defendant cannot demonstrate Plaintiff was on notice of the Privacy Policy on the App. *See, e.g.*, *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099-1100 (9th Cir. 2023) (denying motion to compel arbitration for lack of notice where "Amazon did not provide the court with a copy or description of any such notice" and noting "[i]t was Amazon's burden to show assent, not Jackson's to show lack thereof"); *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *9 (N.D. Cal. July 31, 2023) ("Disney does not provide any evidence as to which process Mr. Sadlock *actually* used. In the absence of any such evidence, Mr. Sadlock fairly argues that the only question is whether he was on inquiry notice based on the Switch Registration Process…") (emphasis in original); *Strehl v. Guitar Center, Inc.*, 2023 WL 9700041, at *6 (C.D. Cal. Nov. 3, 2023) ("[T]he Defendant has the burden to show that, in placing the orders, Plaintiff clicked the second button. Because Defendant has not provided any such evidence, it has not met its burden.").

Even taking the website into account, Defendant's presentation is unavailing. None of the webpages are Defendant's homepage, so Defendant would have to show Plaintiff was aware of and specifically navigated to these pages and then saw the hyperlink to the Privacy Policy. It has not done so. Defendant has not even shown that Plaintiff accessed the homepage of the website itself. And even on these webpages, the hyperlink to the Privacy Policy is buried at the bottom of the page, in the same black font color as regular words on the page, without any underlining, bolding, or color

[6] The Complaint does contain a single reference to Defendant's website, but that is a scriveners' error. Compl. ¶ 89.

change to indicate it is a hyperlink, and without any requirement that users click the hyperlink to continue accessing the website. *See* RJN Exs. A, C.[7]

Such browsewrap agreements are unenforceable for lack of notice. *See*, *e.g.*, *Price*, 712 F. Supp. 3d at 1359 ("Whether because of the notice's small text, inconspicuous color scheme, or potential failure to appear, a reasonably prudent user would not necessarily have known or learned of the existence of Carnival's privacy agreement prior to acting.") (cleaned up); *Smith*, 2024 WL 4539578, at *4 ("Defendant's website does not require additional action by users to demonstrate assent and does not conspicuously notify them that continuing to use to website constitutes assent to the Privacy Policy and Terms of Use. Therefore, Plaintiff's consent cannot be inferred from the record presented by Defendant."); *Nguyen*, 763 F.3d at 1178-79 ("[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."). In addition, Defendant must show its Privacy Policy was presented to users *before* the wiretapping occurred, which it has not done. *Javier*, 2022 WL 1744107, at *2 ("[W]e conclude that the California Supreme Court would interpret Section 631(a) to require the *prior consent* of all parties to the communication.") (emphasis added).

Finally, and compounding these failures, the Privacy Policy Defendant submits was from April 2023 (RJN Ex. B), a full *three years* after Plaintiff created his account on the App. Compl. ¶ 86. Thus, even assuming Plaintiff saw a privacy policy on Defendant's website (and Defendant submits nothing to show Plaintiff did), it could not possibly be *this* Privacy Policy.

*2. Defendant Has Not Shown That The Privacy Policy Disclosed The Wiretapping*

Defendant also asks the Court to take judicial notice of its Privacy Policy, which it claims discloses the wiretapping. RJN Ex. B. The Court should not do so. The Complaint does not mention the Privacy Policy, and Defendant has not addressed whether the Privacy Policy is accessible on the

[7] RJN Ex. B is the Privacy Policy itself, so users would first have to be on notice of the hyperlink to the Privacy Policy to navigate there. Because users are not on notice of any Privacy Policy hyperlink, Defendant has not shown there is constructive knowledge of this page.

App or in what manner users were put on notice of or assented to the Privacy Policy. Because Plaintiff's claims do not depend on a lack of consent (as it is an affirmative defense), judicial notice of the Privacy Policy is improper. *See Turner*, 735 F. Supp. 3d at 1180 (declining to take judicial notice of policy because "it is possible to assess the sufficiency of Plaintiffs' claims on the face of the complaint" and "Plaintiffs did not rely on the DAA for any of their claims").

Defendant cites to two cases in support of its request for notice of the Privacy Policy: *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125 (N.D. Cal. 2015); and *Silver v. Stripe Inc.*, 2021 WL 3191752 (N.D. Cal. July 28, 2021). But "*Garcia* was decided before [the Ninth Circuit] clarified the proper standard for judicial notice and is not binding on this [C]ourt." *Turner*, 735 F. Supp. 3d at 1180 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)). And *Silver* did not "hold that it is appropriate to incorporate documents to find consent when the documents were not even mentioned in the complaint." *Turner*, 735 F. Supp. 3d at 1181. In any event, the defendant in *Silver* submitted the design and content of the relevant webpage *and* the court found users were on constructive notice of the hyperlinks. *Silver*, 2021 WL 3191752, at *4 ("The Court finds that a reasonably prudent user would have been aware of Instacart's privacy policy when placing an order."). Defendant has not made such a showing here, so the Court cannot (and should not) make such a determination. And in *Garcia*, unlike here, the plaintiff made no "allegations … regarding Plaintiff's actual or constructive knowledge of Zimride's Privacy Policy." *Compare Garcia*, 78 F. Supp. 3d at 1137; *with* Compl. ¶¶ 90, 92, 94.

Even taking the Privacy Policy into account, Defendant cannot show that the Privacy Policy disclosed the wiretapping. "In determining consent, courts consider whether the circumstances, considered as a whole, demonstrate that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Calhoun*, 113 F.4th at 1147 (cleaned up). "If that user could have plausibly understood the disclosures as not disclosing that the defendant would engage in particular conduct, then the disclosures are insufficient to establish consent." *Id.* (cleaned up).

Here, Defendant hangs it hat on the fact the Privacy Policy states Defendant "may disclose personal information collected from and about you to service providers, to perform a business,

professional or technical support function for Aaptiv." MTD at 16:7-8 (cleaned up). "Technical support" does not even remotely capture the sophisticated tracking, profiling, and targeted advertising that Twilio and Mixpanel assist in, and "business" and "professional" functions are too ambiguous to disclose the same. *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014) ("[A]ny consent with respect to the processing and sending of messages itself does not necessarily constitute consent to the specific practice alleged in this case—that is, the scanning of message content for use in targeted advertising."). Moreover, this clause does not disclose that Twilio and Mixpanel are disclosing Plaintiff's information to other entities—or are otherwise combining information about users of Defendant's App with their usage of other apps and websites—which does not have anything do to with Defendant. Compl. ¶¶ 45-50, 78-79; *see also McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021) ("Activity on third-party sites and apps that use our services may not be understood by a reasonable user to include data from apps that are not associated with Defendant's services.") (cleaned up). And Defendant does not specify what specific categories of "personal information" are collected by Twilio and Mixpanel. *See Yockey*, 688 F. Supp. 3d at 977 ("Personal information is not synonymous with a word-for-word transcript of all communications both as a matter of common sense and as defined by the policy.") (cleaned up).

Thus, because "there is a factual dispute over whether the [Privacy Policy] sufficiently notified Plaintiff[] of [Defendant's] conduct," the Court cannot dismiss Plaintiff's CIPA claim based on the consent defense. *Turner*, 735 F. Supp. 3d at 1181; *see also McCoy*, 2021 WL 405816, at *6 ("At the motion to dismiss stage, the Court is not prepared to rule that the Privacy Policy establishes an absolute bar to Plaintiff's claims.").

* * *

In sum, Plaintiff alleges he "was not on notice of any wiretapping" and "never consented, agreed, nor otherwise permitted the App to disclose his PII to third parties." Compl. ¶¶ 90, 94. Defendant does not submit any facts—relevant or otherwise—to undercut these allegations, as is its burden. *See Calhoun*, 113 F.4th at 1148. Therefore, the consent defense does not apply. *See Turner*, 735 F. Supp. 3d at 1178 (finding a lack of consent where plaintiffs alleged they "did not give their

consent, written or otherwise, to either Nuance or Chase to allow Nuance to wiretap their confidential communications with Chase") (cleaned up).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion in its entirety. If the Court determines that the pleadings are deficient in any respect, Plaintiffs respectfully request leave to amend to cure any such deficiencies. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Dated: January 22, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jwilner@bursor.com

*Attorneys for Plaintiff*