UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KASRA SARHADI,<br><br>        Plaintiff,<br><br>    v.<br><br>PEAR HEALTH LABS, INC.,<br><br>        Defendant. | Case No. 24-cv-07921-TLT<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND DENYING MOTION TO DISMISS**<br><br>Re: ECF 11, 25 |

On November 11, 2024, Plaintiff Kasra Sarhadi filed a class action complaint against Defendant Pear Health Labs, Inc. doing business as ("dba") Aaptiv ("Aaptiv" or "Defendant"), alleging violations of the Video Privacy Protection Act ("VPPA") and the California Information Privacy Act ("CIPA"). ECF 1, ¶¶ 107–128.

Before the Court are Defendant's motion to dismiss, ECF 11, and motion to compel arbitration, ECF 25. The Court finds these motions appropriate for resolution without oral argument and takes these matters under submission. ECF 36; *see* L.R. 7-1(b) (authorizing courts to dispense with oral argument on any motion except where an oral hearing is required by statute).

After review and consideration of the motion, briefings, attachments and exhibits thereto, the Court **GRANTS** Defendant's motion to compel arbitration and **DENIES** Defendant's motion to dismiss as moot.

**I.    BACKGROUND**

    **A.    Procedural Background**

On November 11, 2024, Plaintiff filed a class action complaint alleging violations of VPPA and CIPA against Defendant. ECF 1. Defendant moved to dismiss the complaint for failure to state a claim. ECF 11. In its motion, Defendant noted that it intended to file a motion to compel arbitration. *Id.* at 2 n.1. Defendant also requested judicial notice eight exhibits in support

of its motion to dismiss. ECF 12. Plaintiff timely filed an opposition, ECF 14, and an opposition to the request for judicial notice, ECF 15. Defendant timely filed a reply. ECF 16.

Before the initial case management conference, the parties stipulated to stay proceedings; however, the Court denied the stipulation as untimely and lacking good cause. ECF 18. In the case management statement and during the case management conference, Defendant repeatedly noted its intent to file a motion to compel arbitration. ECF 19, at 1–6; ECF 21 (setting deadline to file motion to compel arbitration).

On March 14, 2025, Defendant filed its motion to compel arbitration, asserting that Plaintiff agreed to submit his claims to binding, individual arbitration. ECF 25. Plaintiff timely filed an opposition, ECF 31, and Defendant timely filed a reply, ECF 35.

**B.     Factual Background**

### 1. Plaintiff's Allegations

Pear Health Labs, Inc. dba Aaptiv is a Delaware Corporation with its principal place of business in Carlsbad, California. ECF 1, ¶ 8. Defendant's mobile application (the "App") is a popular audio and video-based fitness app, offering pre-recorded workout videos and extensive gym network access. *Id.* ¶ 20. The App is available for download on both iOS and Android and is available for use throughout the United States. *Id.* ¶ 21. When a user creates an account on the App, the App prompts the user to enter personal information through a series of questions as part of the account creation process. *Id.* ¶ 24. Each user must provide their full name, email address, height, weight, and information about the user's fitness and weight loss goals in order to create an account and access the content on the App. *Id.* ¶ 25.

Plaintiff Kasra Sarhadi is a citizen of California who resides in San Francisco, California. *Id.* ¶ 7. Plaintiff was in California when he used the App and entered information into the App. *Id.* Plaintiff alleges that Defendant disclosed information to third parties sufficient to identify Plaintiff and class members, view and use their private communications, and learn the specific videos they watched. *Id.* ¶ 28.

Specifically, Plaintiff asserts that his personally identifiable information ("PII") was disclosed to third parties Twilio and MixPanel. *Id.* ¶¶ 35–36. Twilio is a customer engagement

1  platform that is integrated into the App. *Id.* ¶¶ 37–39. MixPanel is an analytics tools that captures

2  events, users, and properties and is also integrated into the App. *Id.* ¶¶ 40–50. Both Twilio and

3  Mixpanel focus on creating comprehensive user profiles that encompass not just a user's activity

4  on Defendant's App, but those same users' activities on other apps and websites. *Id.* ¶¶ 45–50,

5  75–76. Plaintiff alleges that those profiles are then disclosed to Twilio's and Mixpanel's other

6  clients, or even further third parties like Google and Meta, for use in targeted advertising. *Id.* ¶¶

7  50, 78–79. Defendant is enriched through this process because its App users become even more

8  valuable to advertisers when users' PII is conglomerated in these profiles. *Id.* ¶ 82.

### 2. Arbitration Agreement

Plaintiff alleges that he downloaded the App on his Apple iPhone and created an Aaptiv account in June 2020. *Id.* ¶ 86. The account creation screen includes spaces to type in the user's first name, last name, email address, and password. ECF 25-1, Declaration of Gregory Altin ("Altin Decl."), ¶¶ 22–23, Exhibit ("Ex.") 9. Underneath these spaces, the user needed to click a button labeled "Join Aaptiv" to proceed. *Id.* Beneath this button, text read "By joining Aaptiv, you agree to our Terms of Service." *Id.* In 2020, the notice appeared in dark text on a white background. *Id.* The words "Terms of Service" were capitalized and set off with blue, underlined text to indicate they are hyperlinked. *Id.* ¶ 24, Ex. 9. The hyperlink on this page to the "Terms of Service" redirected the user to www.aaptiv.com/terms. *Id.* ¶ 24, Ex. 10. In 2020, the terms of use page contained Aaptiv's End User License Agreement and Terms of Service, effective December 20, 2018 (the "EULA"). *Id.* at Ex. 5.

Any new user creating an account on the App in 2020 needed to navigate to Aaptiv's sign-in page, enter information, and click "Join Aaptiv" to set up an account. *Id*. ¶¶ 10, 23. A 2020 App user could not log in until the user created an account through that page by clicking "Join Aaptiv" and consented to the EULA. *Id.* ¶¶ 11, 23.

Paragraph 11 of the EULA is entitled "Dispute Resolution." *Id.* ¶¶ 13–18, Ex. 5. Subsection "a. General," of Paragraph 11 provided in 2020:

> You and Aaptiv agree that any dispute arising out of or in any way related to this EULA or your use of the App, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and regardless of whether a claim arises during or after the termination of this EULA, will be resolved by binding arbitration. YOU UNDERSTAND AND AGREE THAT, BY ENTERING INTO THIS EULA, YOU AND AAPTIV ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

*Id.* Subsection "c. Arbitrator" provided in 2020:

> Any arbitration between you and Aaptiv will be governed by the Federal Arbitration Act and the Commercial Dispute Resolution Procedures and Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this EULA, and will be administered by the AAA. The AAA Rules and filing forms are available online at www.adr.org. The arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this binding arbitration agreement.

*Id.* Defendant contends that by agreeing to the EULA during account creation, Plaintiff broadly agreed to arbitrate "any dispute arising out of or in any way related to this EULA or your use of the App." *Id.*

## II. LEGAL STANDARDS

### A. Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") governs any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Under the FAA, plaintiffs' arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* As the Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). This "'liberal federal policy favoring arbitration agreements'" applies "'notwithstanding any state substantive or procedural policies to the contrary.'" *Id.* at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Under the FAA, a district court determines, (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Brennan v.*

4

1  *Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  To evaluate the validity of an arbitration

2  agreement, federal courts "should apply ordinary state-law principles that govern the formation of

3  contracts."  *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995).  If the court is

4  satisfied "that the making of the arbitration agreement or the failure to comply with the agreement

5  is not in issue, the court shall make an order directing the parties to proceed to arbitration in

6  accordance with the terms of the agreement."  9 U.S.C.  § 4.  "[A]ny doubts concerning the scope

7  of arbitrable issues should be resolved in favor of arbitration."  *Moses*, 460 U.S. at 24–25.

### B. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face."  Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  However, mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### III. MOTION TO COMPEL ARBITRATION

Before the Court is Defendant's motion to compel arbitration.  ECF 25.  The parties first dispute whether Defendant waived its right to compel Plaintiff to submit his claims to binding, individual arbitration.  ECF 31, at 2–3; ECF 35, at 9–11.  The parties next argue whether Plaintiff was on notice of the arbitration agreement, whether Pear Health Labs dba Aaptiv can enforce an arbitration agreement between Plaintiff and Aaptiv, Inc., and whether the agreement was unconscionable.  ECF 31, at 3–17; ECF 35, at 2–15.  The Court will address each argument in turn.

**A.     Defendant did not waive its right to compel arbitration.**

As an initial matter, Plaintiff argues that Defendant waived its right to compel arbitration. ECF 31, at 2.  Plaintiff contends that by taking advantage of being in court for four months and filing a motion to dismiss, Defendant actively litigated the merits of the case.  *Id.*  Defendant counters that filing a motion to dismiss does not constitute waiver of a right to arbitrate and rather, Defendant repeatedly and unambiguously asserted its plan to move to compel arbitration, including in its motion to dismiss, in a demand letter to Plaintiff, in its initial disclosures, in the parties' joint statement, and to the Court during the case management conference.  ECF 35, at 10.

The Ninth Circuit has held that the party asserting waiver of the right to compel arbitration "must demonstrate: (1) knowledge of an existing right to compel arbitration and (2) intentional acts inconsistent with that existing right."  *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023).

Here, the parties do not dispute that Defendant knew of an existing right to compel arbitration as it repeatedly asserted its plan to move to compel arbitration since the outset of litigation.  *See* ECF 35, at 10.  However, Plaintiff challenges the second element, arguing that Defendant, by actively litigating the merits of the case, acted inconsistently with the right to compel arbitration.  ECF 31, at 2.

For the second element, "a party generally acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court."  *Id.* (internal quotations and citations omitted).  Because there is no concrete test for assessing whether Defendant took act inconsistent with its right to arbitration, the Court considers the totality of the parties' actions.  *Id.*

Here, the action was filed on November 12, 2024.  ECF 1.  Two months later, Defendant filed a motion to dismiss, noting that it also intended to file a motion to compel arbitration.  ECF 11, at 2 n.1.  Defendant further sought to stay the litigation pending mediation.  ECF 17.  On February 10, 2025, Defendant repeatedly asserted its intention to file a motion compel arbitration. ECF 19, at 1–6.  In the case management conference, Defendant again asserted its intent, and the

6

Court provided a deadline of March 26, 2025. ECF 21. On March 14, 2025, Defendant filed the instant motion to compel arbitration at four months into the life of the case. ECF 25.

Plaintiff cites to several cases in which courts found waiver of the right to compel arbitration. ECF 31, at 2–3. However, all of Plaintiff's cited authorities are distinguishable because here, Defendant repeatedly notified Plaintiff of its intent to file a motion to compel arbitration since the outset of litigation. *See Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016) ("The defendants did not even note their right to arbitration until almost a year into the litigation and did not move to enforce that right until well after that time."); *Guess?, Inc. v. Super. Ct.*, 79 Cal. App. 4th 553, 557 (Cal. Ct. App. 2000) ("For four months, Kirkland remained mute on the subject of arbitration but vocal, in court and out, on the subject of its other objections to Guess's discovery demands, taking full advantage of the opportunity to test the validity of Guess's claims, both legally and factually, primarily at Guess's expense."); *Morgan v. Sundance, Inc.*, 596 U.S. 411, 414–15 (2022) (defendant answered the complaint, asserted 14 affirmative defenses "but none mentioning the arbitration agreement" and waited almost eight months); *Kaneko Ford Design v. Citipark, Inc.*, 202 Cal. App. 3d 1220, 1228–29 (Cal. Ct. App. 1988) (plaintiff waived its right to arbitrate by waiting five and half months after filing the complaint and failing to notify defendant, who answered the complaint, of its intent to arbitrate).

In contrast, in *Armstrong*, the Ninth Circuit found that there was no waiver of arbitration where defendant "explicitly and repeatedly stated its intent to move to compel arbitration in both case management statements and in the initial case management conference before the district court." *Armstrong*, 59 F.4th at 1015. Defendant was "consistently vocal about its intent to move to compel arbitration." *Id.*

Here, like in *Armstrong*, Defendant has not waived its right to compel arbitration because it consistently indicated its intent to file a motion to compel arbitration from the outset of litigation. From a judicial efficiency standpoint, Defendant would have been better off filing the motion to compel arbitration before its motion to dismiss. Nevertheless, Plaintiff has not carried his burden in establishing waiver.

**B.      The parties entered into a sign-in wrap agreement.**

"To form a contract under California law, there must be actual or constructive notice of the agreement, and the parties must manifest mutual assent." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013–14 (9th Cir. 2024) (citation omitted). In California, courts have historically recognized two types of internet contracts: (1) a browsewrap agreement, where "an internet user accepts a website's terms of use merely by browsing the site" and (2) a clickwrap agreement, which "requires users to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Id.* at 1014. Recently, "[a] third category of agreement has become known as a 'sign-in wrap,' in which a website 'notifies the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advises the user that he or she is agreeing to the terms of service when registering or signing up." *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020) (citation and quotations omitted).

"Under California law, a sign-in wrap agreement may be an enforceable contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Keebaugh*, 100 F.4th at 1014 (citation and quotation omitted).

This action involves a sign-in wrap agreement. ECF 25, at 3; ECF 31, at 7. The burden is on Defendant to demonstrate that there was mutual assent to the agreement to arbitrate. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023). The Court will address each element of the sign-in wrap agreement in turn.

**1.   Plaintiff had reasonably conspicuous notice.**

Because the reasonable notice inquiry is context- and fact-specific, courts consider both the context of the transaction and the placement of the notice to determine whether a website provides reasonably conspicuous notice of a sign-in wrap agreement. *Lee v. Plex, Inc.*, No. 24-CV-02386-EKL, 2025 WL 948118, at *3 (N.D. Cal. Mar. 28, 2025) (citing *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 514–15 (9th Cir. 2023)).

1      First, courts consider the "context of the transaction," including the "nature of the service or goods offered." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1155 (9th Cir. 2025). Where a transaction involves a "continuing relationship" with the website operator, the user should expect to be "bound by terms, even if not explicitly told." *Id.*

      Second, courts consider the visual aspects of the website "such as font size, text placement, and overall screen design." *Id.* A cluttered design may contain "visual elements [that] draw the user's attention away" from important terms. *Berman*, 30 F.4th at 857. Similarly, placing a notice "directly above or below the relevant action item in a manner disrupting the natural flow of actions" is more likely to draw the user's attention to the fact that terms apply. *Chabolla*, 129 F.4th at 1157. Additionally, the notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856. When small or hard-to-read font is used, the "comparatively larger font used" for other elements of the webpage may "direct[ ] the user's attention everywhere else." *Id.* at 857. Finally, if a hyperlink is used to disclose terms and conditions, "the fact that a hyperlink is present must be readily apparent." *Id.* "A web designer must do more than simply underscore the hyperlinked text to ensure that it is sufficiently 'set apart' from the surrounding text." *Id.*

      The Court will first address the context of the transaction and then the Court will address the visual factors.

### a. Context of the transaction supports reasonably conspicuous notice.

      Defendant argues that the context of the transaction supports reasonably conspicuous notice. ECF 25, at 8–10. Plaintiff alleges he "used the App regularly" for a period of over 4 years. ECF 1, ¶ 93. Defendant contends that Plaintiff should have reasonably expected his relationship with Aaptiv to be governed by some sort of terms and he was on notice for a hyperlink to Aaptiv's EULA. ECF 25, at 10.

      In *Keebaugh*, the Ninth Circuit considered a sign-in wrap agreement used when user-players of a video game app for Games of Thrones sign up for the app. *Keebaugh*, 100 F.4th at 1009–13. Users were presented with a screen that required users to press a "Play" button before they could access the game. *Id.* at 1014. As part of the sign-up process, users were required to

9

1   advance through the sign-in screen which stated, "By tapping 'Play,' I agree to the Terms of
2   Service." *Id.* Users were notified prior to downloading the game that the app offers in-app
3   purchases, and there was no time limit imposed by Warner Bros. on how long the user may access
4   the game. *Id.* at 1020. The Ninth Circuit found that "the prudent internet user necessarily
5   anticipates ongoing access to that app at the user's discretion—at least until the user deletes the
6   app, conditions imposed on the use of the app change, or the user decides to simply stop playing
7   the game." *Id.* This was different from a typical one-and-done interaction between the user and a
8   traditional website because of the user's "ongoing access to the app." *Id.*

9         Similarly, in *Ghazizadeh*, the court found that a user who signs up for Coursera necessarily
10  anticipates ongoing access to Coursera at the user's discretion in order to continue viewing the
11  pre-recorded videos. *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 925 (N.D. Cal. 2024)
12  (internal quotations and citations omitted). Plaintiff's complaint underscored the ongoing nature
13  of Coursera's services as he alleged that the consistently viewed videos on Coursera to complete
14  various certificate programs. *Id.* at 926.

15        Like in *Keebaugh* and *Ghazizadeh*, Plaintiff's interaction with the App was more than a
16  one-time purchase or transaction. Plaintiff was required to create an Aaptiv account and then
17  engaged in an ongoing relationship with Aaptiv. ECF 1, ¶¶ 23, 61.

18        In response, Plaintiff does not dispute that he engaged in an ongoing relationship with
19  Aaptiv but argues that context of the transaction is non-dispositive. ECF 31, at 14. The Ninth
20  Circuit has found "the context of the transaction is a non-dispositive factor under California law,
21  used to evaluate whether a website's notice is sufficiently conspicuous." *Keebaugh*, 100 F.4th at
22  1019. However, the context of the transaction remains a relevant factor. *Id.* Here, the Court finds
23  that the context of the transaction supports reasonably conspicuous notice.

24        **b. Visual placement supports reasonably conspicuous notice.**

25        Defendant next argues that the placement of the notice supports reasonably conspicuous
26  notice. ECF 25, at 10. Plaintiff argues that the hyperlinked terms and conditions did not put him
27  on notice. ECF 31, at 3–14.
28

   Here, Defendant's sign-up screen consists of a white background, containing four boxes for Plaintiff to fill in. Altin Decl. Ex. 9. Directly underneath the four boxes is a button labeled "Join Aaptiv" that must be clicked to proceed. *Id.* At the bottom of the page, in small black text on a white background, the notice reads "By joining Aaptiv, you agree to our Terms of Service." *Id.* The words "Terms of Service" are capitalized and set off with blue, underlined text to indicate they are hyperlinked. *Id.* The page is uncluttered with a white screen gap between the "Join Aaptiv" button and the notice. *Id.* The screen does not include any other graphics, hyperlinks, notices. *Id.*

   Plaintiff provides several pages of arguments, contesting the conspicuousness of the hyperlinked text. ECF 31, at 4–14. Plaintiff first argues that the notices in *Berman* and *Chabolla* are controlling. *Id.* at 4–7 (citing *Berman*, 30 F.4th at 861 and *Chabolla*, 129 F.4th at 1174). However, side-by-side comparison of the notices indicate clear distinctions. In *Berman*, the website was full of "other visual elements [that] draw the user's attention away from the most important part of the page" and the notice was "buried in fine print." *Berman*, 30 F.4th at 857. Similarly, in *Chabolla*, the screen was "crowded," and the notice was obscured by other images and intervening and muddled text about signing up with Facebook or language regarding gift cards. *Chabolla*, 129 F.4th at 1157. Plaintiff's other cited notices are clearly more cluttered than Aaptiv's notice. *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 480–81 (Cal. Ct. App. 2021) (the screen was cluttered, and the notice appeared "outside the white box containing the payment fields where the consumer's attention would necessarily be focused."); *Strehl v. Guitar Ctr., Inc.*, No. LA CV23-02603 JAK (RAO), 2023 WL 9700041, at *7 (C.D. Cal. Nov. 3, 2023) (the font size of the surrounding text and location of the "Complete Order" button draw "the user's attention away from the Purchase Terms hyperlink").

   Plaintiff next argues that that the hyperlink appears in tiny black font that looks almost identical to the color of the accompany text and "is barely legible to the naked." ECF 31, at 8 (*Berman*, 30 F.4th at 856). The hyperlink's color is non-contrasting, and even if it is slightly different color, that by itself it's not sufficient. *Id.* at 9–10.

11

1    Plaintiff's arguments would be persuasive if they were not drenched in hyperbole. The hyperlink is clearly an underlined dark blue, capitalized text that is written in a legible size. *See* Altin Decl. Ex. 9; *cf. Keebaugh*, 100 F.4th at 1021 (finding hyperlink to be conspicuous because while it was written in the exact same color white as the notice itself, the entire notice contrasted with the dark background of the app screen).

Plaintiff next complains about the considerable distance from the "Join Aaptiv" button and the notice. ECF 31, at 11. Plaintiff again analogizes to the screen in *Chabolla*. *Chabolla*, 129 F.4th at 1157. However, Plaintiff ignores that, in *Chabolla*, the sign-in screen contained other, intervening text and buttons before the notice. *Id.* Here, while there is some distance between the "Join Aaptiv" button and the notice, this is offset by the fact that there is no intervening text or buttons in between such that the eyes of the user flow to the notice.

Finally, Plaintiff argues that the hyperlink was the least prominent element on the page, relying again on sign-up screen analogies that are more cluttered than the sign-up screen at issue. *See* ECF 31, at 13 (citing *Serrano v. Open Road Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089 (C.D. Cal. 2023)). Defendant counters that Plaintiff's final argument is misleading because the single-sentence notice (and hyperlink therein) is the only element on Aaptiv's sign-in screen other than the form fields and the "Join Aaptiv" button. ECF 35, at 8. The Court agrees. Given the uncluttered nature of the sign-up page, Plaintiff's least prominent element argument falls flat.

The Court finds that the sign-up screen supports a finding that the notice is reasonably conspicuous. On balance and considering the full context of the hyperlink, the sign-up screen satisfies the visual requirements to provide conspicuous notice that a reasonably prudent internet user "would have seen" the hyperlink and would have been able to locate the hyperlinked EULA. *Oberstein*, 60 F.4th at 516.

Defendant have established the reasonably conspicuous notice element. The Court will next consider the unambiguous manifestation of assent element.

### 2. Plaintiff unambiguously manifested his assent.

"Reasonable conspicuousness alone is not sufficient to bind a user—a user must agree to the terms, not merely see them." *Chabolla*, 129 F.4th at 1158. "The second part of the test—

whether the user takes some action that unambiguously manifests assent—is relatively straightforward." *Oberstein*, 60 F.4th at 515 (quoting *Berman*, 30 F.4th at 857). "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

Here, to create an account, Plaintiff was required to enter his name, email, and password and to affirmatively click a button stating "Join Aaptiv." Altin Decl. ¶¶ 22–23, Ex. 9. Aaptiv's conspicuous notice unambiguously stated that, "By joining Aaptiv, you agree to our Terms of Service." *Id.*

Plaintiff does not dispute that this element in the opposition. *See* ECF 31. The Court finds that Plaintiff had reasonably conspicuous notice of the EULA and he manifested his assent to the EULA by clicking "Join Aaptiv" —creating an enforceable sign-in wrap agreement to arbitrate his claim.

**C.    The 2018 EULA between Aaptiv, Inc. and Plaintiff is enforceable by Aaptiv.**

Plaintiff next argues that the 2018 EULA is between Plaintiff and an entity called "Aaptiv, Inc." ECF 31, at 16. However, Defendant's 2023 EULA lists "Pear Health Labs Inc. dba Aaptiv" as the contracting party. *Id.* Plaintiff argues that Defendant does not explain its relationship to this entity or why it would be allowed to benefit from that entity's contracts including the 2018 EULA. *Id.*

Defendant contends that Plaintiff signed up for the App when it was owned and controlled by Aaptiv, Inc., and he continued using it after it was acquired and became controlled by Pear Health Labs, Inc. dba Aaptiv in 2021. ECF 35-1, Supplemental Declaration of Gregory Altin ("Altin Supp. Decl.), ¶ 2. Defendant updated the 2018 EULA in 2023, Altin Dec. ¶ 13, and Plaintiff does not dispute that the 2023 EULA is between him and "Pear Health Labs Inc. dba Aaptiv," Altin Decl. Ex. 2. Plaintiff implicitly consented to any changes in the 2018 EULA, which provides a clear process for Plaintiff to oppose modifications to the agreement that Plaintiff

13

does not claim to have followed. Altin Decl. Ex. 7 at 8. The 2018 EULA also provides that it would "inure to the benefit of our successors and assigns." *Id.* at 10.

Here, the Court finds that Plaintiff is bound by the 2023 EULA and the provisions of the 2018 EULA extend to Aaptiv Inc.'s successors which would be Pear Health Labs Inc. dba Aaptiv. The Court finds that the 2018 EULA between Aaptiv, Inc. and Plaintiff is enforceable by Pear Health Labs Inc. dba Aaptiv.

### D.  The placement of the arbitration agreement does not weigh against enforceability.

Finally, Plaintiff argues that because the agreement to arbitrate appeared on page 7 of the 11 page EULA, and it was not bolded and in capital letters, the Court should not enforce it. ECF 31, at 17. In the same paragraph, Plaintiff concedes that the EULA references that arbitration agreement on page 1. *Id.*

Defendant argues that to prove the arbitration agreement is unenforceable, Plaintiff must show that it is both procedurally and substantively unconscionable. ECF 35, at 15; *Baltazar v. Forever 21, Inc.*, 62 Cal.4th 1237, 1244 (2016). Simply arguing that the arbitration agreement is hidden in the EULA is insufficient to establish unconscionability. Further, Plaintiff's argument is largely undercut by Plaintiff's confession that that arbitration agreement is mentioned on the first page of the EULA. The Court agrees and finds that Plaintiff has not met his burden in establishing unconscionability. *See Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal.4th 223, 236 (2012) ("[T]he party opposing arbitration bears the burden of proving any defense, such as unconscionability.") (citation omitted).

### E.  The Court stays the action pending arbitration.

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see* 9 U.S.C. § 3.

Here, Plaintiff does not request a stay in his opposition. *See* ECF 31. On the other hand, Defendant repeatedly requests that the Court exercise its discretion and dismiss the action. ECF 25, at 19–20; ECF 35, at 2. However, the Court find that *Smith*'s underlying policy in allowing

14

the parties to return to federal court if arbitration breaks down or fails to resolve the dispute still holds weight here. *See Smith*, 601 U.S. at 477. "That return ticket is not available if the court dismisses the suit rather than staying it." *Id.* Accordingly, the Court exercises its discretion and **STAYS** this action pending arbitration of Plaintiff's claims.

## IV. MOTION TO DISMISS

Defendant also filed a motion to dismiss. ECF 11. Because the Court has granted the motion to compel arbitration, the Court **DENIES** the motion to dismiss as moot.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's motion to compel arbitration and **DENIES** Defendant's motion to dismiss as moot.

The Court **STAYS** the action pending arbitration. The parties must provide status reports regarding the status of arbitration every sixty (60) days starting on **June 26, 2025**.

**IT IS SO ORDERED.**

Dated: April 17, 2025

_____
TRINA L. THOMPSON
United States District Judge